# Appendix A

2014 WL 3747160
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

DORCHESTER FINANCIAL HOLDINGS
CORPORATION f/k/a Dorchester
Financial Securities, Inc., Plaintiff,
v.
BANCO BRJ, S.A., Defendant.

No. 11–CV–1529 (KMW)
(KNF).   |   Signed July 3, 2014.

**MEMORANDUM AND ORDER**

KEVIN HATHANIEL FOX, United States Magistrate Judge.

**\*1** Before the Court is the plaintiff's, Dorchester Financial Holdings Corporation f/k/a Dorchester Financial Securities Inc. ("Dorchester"), motion "for an order pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure compelling [defendant] Banco BRJ, SA ["BRJ"] "to produce documents Dorchester has requested pursuant to R[ule] 34 [of the Federal Rules of Civil Procedure]." BRJ opposes the motion.

*Plaintiff's Contentions*

In support of the motion, the plaintiff submitted its memorandum of law, to which Exhibits A through K are attached. The plaintiff contends that, "[o]n September 17, 2002 Dorchester commenced action 02 cv 7504 against Banco and SWIFT [Society for Worldwide Interbank Financial Telecommunication]." According to the plaintiff, "[t]he basis of this R. 37(a)(1) motion to compel relevant responses to its R. 34 request is that all three (3) declarations[, two by Luiz Augusto de Queiroz and one by Luiz Claudio de Queiroz,] filed with the Court [in the previous action against Banco and SWIFT], under penalty of perjury, contained lies and misrepresentations, which go to the heart of the current litigation."The plaintiff asserts that, in the previous action,

> on October 13, 2003 Jonathan I. Blackman, SWIFT's attorney wrote a letter to the Court admitting that (a) Banco sent the SWIFT message at issue (b) the SWIFT message contained the text of

the letter of credit numbered "BBRRJLC449977810" which is referenced in the SWIFT message (c) SWIFT sent the message on Banco's behalf to Chase Manhattan Bank and (d) SWIFT simply acted as Banco's messenger.

The plaintiff maintains that the October 13, 2003 letter by SWIFT's counsel shows that "Banco did issue a letter of credit to Dorchester and advised Chase Manhattan. We know this because clear reference is made to the text of the letter of credit in his letter to the Court."The plaintiff contends:

> Banco has refused to provide any relevant evidence in this action. It has only provided Dorchester with standard boilerplate responses. The documents requested are neither overbroad nor confidential. The parameters are clear. Banco knows what Dorchester seeks. If Banco truly wanted to look at the lowest common denominator it would be those documents that Mr. Blackman reviewed that enabled him to draft and sign his October 13, 2003 letter. He wrote and signed that letter based upon reviewing certain documents. Clearly, at a minimum, Banco has those documents in their file.... Dorchester at a minimum requires the documents Banco sent to Chase using SWIFT that Mr. Blackman reviewed to determine that Banco sent the SWIFT message, that the letter was sent using English, that the text included 2 bank officers named Luiz Augusto de Quieroz and Luiz Alcazar, that Dorchester was a U.S. beneficiary located in New York, New York, that the SWIFT message was sent to Chase Manhattan Bank who advised Dorchester and that was regarding the letter of credit numbered BBRRJLC449977810.

*Defendant's Contentions*

**\*2** The defendant contends that the plaintiff's motion fails to comply with this court's Local Civil Rule 37.1, which requires

the movant to "set forth verbatim in the motion papers each discovery request and response to which the motion or application is addressed ."The defendant asserts that it "has no personal knowledge of what documents SWIFT's counsel, Mr. Blackman, reviewed in 2003," and it has provided its objections and responses to the plaintiff's document requests, stating unequivocally that "no such documents ever existed" in its files and that it has no documents regarding the plaintiff other than those the plaintiff provided to the defendant as part of this litigation. The defendant asserts:

> It cannot be stated any more simply or straightforwardly than BRJ has written in its Response to Dorchester's Request No. 6: *"BRJ has never been involved in any letter of credit or other transaction with Dorchester, whether involving Chase, SWIFT, other third parties or otherwise."*(underlining added). In fact, BRJ has produced daily accounting journals and its monthly payroll records from the relevant time period to show, by the absence of any entry related to the events or employees alleged by Dorchester, that the documents and facts upon which Dorchester relies have been fabricated.

Moreover, the October 13, 2003 letter of SWIFT's counsel to the court in the prior action "is not evidence, that any message was sent over the SWIFT system by the real BRJ. *A fortiori,* it is not evidence that BRJ is withholding any documents that could be the subject of a Rule 37 motion to compel."According to the defendant, the assigned district judge wrote in a 2012 opinion, which was reversed by the Second Circuit on other grounds, that "SWIFT's statement is not evidence that the message was sent by BRJ ."

The defendant contends it is entitled to its attorney's fees and costs for defending the plaintiff's frivolous motion to compel, and the plaintiff had been warned by the assigned district judge in her "January 24, 2012 opinion that [it] should not attempt to argue that SWIFT counsel's statements in connection with SWIFT's motion to dismiss the Prior Action is competent evidence that the real BRJ sent the alleged message to Chase about Dorchester over the SWIFT system."The defendant maintains that, "not only is there no 'substantial justification' for the motion to compel, it is flagrantly unjustified."The defendant seeks $8,500 in

attorney's fees pursuant to Rule 37(a)(5)(B) of the Federal Rules of Civil Procedure.

### Plaintiff's Reply

In reply, the plaintiff submitted its memorandum of law and a declaration by Sheila Baker ("Baker"). The plaintiff contends that, in support of its motion, it "relies" not only "on the SWIFT letter," but also

> on cold hard factual evidence, which is coming from the best possible source. It is coming from the person who retrieved the message from Chase in October 2001. Sheila Baker, the JP Morgan Chase Vice President retrieved and secured the SWIFT message as noted in her declaration. Dorchester relies on her declaration and the SWIFT letter, who Sheila Baker, Chase VP reinforces. On this basis Banco must be compelled to produce the evidence Dorchester seeks. They [sic] possess it. Dorchester has produced clear and unequivocal evidence that Banco must be compelled to produce the R. 34 evidence or face appropriate sanctions.

**\*3** According to the plaintiff, the defendant and its "lawyers have intentionally set in motion a scheme to hinder the fact finder's fair adjudication of the case, hence the January 24, 2012 dismissal and a three-year delay in adjudicating this action."The plaintiff contends, "[a]t the very minimum at this point Dorchester's attorneys are entitled to the fees and costs expressed in the attached *Reply Affirmation of Counsel* for having to bring this substantive motion."

Baker states in her declaration, dated June 5, 2014: "I have had the opportunity to refresh my collection [sic] by reviewing the 2–page document appended to my declaration as Exhibit A." She states that, in October 2001, she was "employed at JP Morgan Chase Bank as an officer of the bank" and was "the banker assigned to Dorchester Financial Securities Inc., ... at the Chase Manhattan Bank."According to Baker:

> 4. At or about October 19, 2001 TJ Morrow, the attorney for Dorchester asked me to retrieve a SWIFT message that was sent from a bank called Banco BRJ, SA to

the Chase Manhattan Bank for his client, Dorchester that was addressed to me at the Chase Manhattan Bank. 5. I consulted the proper personnel at Chase Manhattan Bank and made proper internal bank inquires. 6. On or about October 22, 2001 I secured in my possession a 2–page document from the Chase Manhattan Bank Communications Department. I was told that it was a bank message, which was sent to Chase Manhattan Bank using the S.W.I .F.T messaging service that Chase Manhattan Bank uses to communicate current international messages. The 2–page document I secured is appended to this declaration as Exhibit A. My select Banking fax heading appears on the document from October 22, 2001 as well. 7. On or about October 22, 2001, I told Mr. Morrow that I had found the document he had requested. 8. I recall that shortly thereafter Mr. Morrow appeared at the Chase Manhattan Bank in New York, N.Y. where I was employed. When he appeared he asked me to confirm who had sent the SWIFT message to the Chase Manhattan Bank for Dorchester. 9. I called the Chase Communications Department and spoke to an officer who confirmed to me that the sender of the SWIFT message appeared in the fourth left hand paragraph of the SWIFT message and that it was "Banco BRJ, SA, Rio de Janeiro, Brazil." 10. That same Chase Manhattan Bank Communications officer also confirmed to me (a) that the SWIFT message was received by Chase Manhattan Bank "as is" (b) that the text of the SWIFT message contained a letter of credit numbered BBRRJLC449977810 (c) that the text of the SWIFT message was written and sent by Banco BRJ, SA to the Chase Manhattan Bank with the electronic signature of two (2) bank officers named Luis Alcazar and Luiz Augusto de Queiroz, just as it appears in the text of Exhibit A on page 2.... 11. I am certain from my review of the document that Exhibit A is an authentic Chase Manhattan Bank document and is the same document that I retrieved and handed to Mr. Morrow in October 2011.

### Defendant's Sur—Reply

**\*4** The defendant contends that Baker's declaration is not probative of the provenance of the SWIFT message because it contains hearsay, since she "purports to testify as to the statements of an unidentified Chase Communications officer," and, as such, is inadmissible. Moreover, the alleged message annexed to her declaration as Exhibit A "has not been authenticated by Chase and does not qualify as a Chase business record admissible under FRE 803(6)." According to the defendant, "the question is whether it was a duly authorized transmission from the real BRJ or a counterfeit

created by an imposter."The defendant points out that "[t]he message itself carries a warning in a large box in capital letters on the first page: 'CAUTION ...*THIS MESSAGE WAS RECEIVED UNAUTHENTICATED...* UNDER NO CIRCUMSTANCES SHOULD A FINANCIAL BEARING TRANSACTION BE PROCESSED IN RESPONSE TO THIS MESSAGE!!!' " The defendant asserts that, "if this was an authorized SWIFT message involving a legitimate $100 million or $250 million letter of credit transaction, the banks involved would use appropriate SWIFT protocols for a 'financial bearing transaction.' " The defendant maintains that, "the 'Luis Alcazar' whose name appears on the SWIFT message referenced in the Baker Declaration (a) was not a BRJ employee and (b) is the same name used in another fraudulent SWIFT message that was used by the Florida Attorney General to prosecute imposters pretending to be BRJ." Moreover, "[t]he 'electronic signatures' to which Ms. Baker refers in her Declaration contain codes that bear no relation to codes used by the real BRJ," as it is explained in the August 25, 2011 declaration by Luiz Augusto de Queiroz.

According to the defendant,

> the real BRJ has declared and has produced records to show that it never had dealings with Dorchester or the supposed applicant for the alleged letter of credit, Africa Capital Partners ("ACP") and that none of the so-called "BRJ" documents that Dorchester has produced conform to the actual numbering systems, corporate seals, stationary, handwritten signatures or even the usual language (Portuguese) in real BRJ documents. Dorchester's counsel TJ Morrow admitted in his deposition that he suspects ACP of being an imposter and that he thought of suing it; ACP stopped communicating with Dorchester in 2001 and Morrow thereafter learned that its alleged office address in London was merely a front.

The defendant contends that Baker's declaration is not evidence that the real BRJ authorized the SWIFT message annexed to the declaration or that BRJ is withholding any documents. The defendant seeks additional attorney's fees and costs related to the plaintiff's introduction of the Baker declaration.

## Legal Standard

On notice to other parties and all affected persons, a party may move for an order compelling disclosure or discovery. The motion must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action.

**\*5** Fed.R.Civ.P. 37(a)(1).

The meet-and-confer requirement mandates that parties actually meet, in person or by telephone, and make a genuine effort to resolve the dispute by determining ... what the requesting party is actually seeking: what the discovering party is reasonably capable of producing that is responsive to the request; and what specific genuine issues, if any, cannot be resolved without judicial intervention.... Under ordinary circumstances ... failure to meet and confer mandates denial of a motion to compel.

Prescient Partners, L.P. v. Fieldcrest Cannon, Inc., No. 96 Civ. 7590(DAB) JCF, 1998 WL 67672, at *2–3 (S.D.N.Y. Feb. 18, 1998) (citations omitted).

Upon any motion or application involving discovery or disclosure requests or responses under Fed.R.Civ.P. 37, the moving party shall specify and quote or set forth verbatim in the motion papers each discovery request and response to which the motion or application is addressed. The motion or application shall also set forth the grounds upon which the moving party is entitled to prevail as to each request and response.

Local Civil Rule 37.1.

"[M]otions to compel under Fed.R.Civ.P. 37... are entrusted to the sound discretion of the district court."United States v. Sanders, 211 F.3d 711, 720 (2d Cir.2000).

## Application of Legal Standard

### Procedural Deficiencies

The plaintiff's motion does not include a certification, required by Rule 37(a)(1), that it has in good faith conferred or attempted to confer with the defendant in an effort to obtain disclosure or discovery without court action. Accordingly, the plaintiff's motion is denied on that ground.

The plaintiff's motion contains other deficiencies. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."Fed.R.Evid. 901(a)."A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."Fed.R.Evid. 602. Exhibits A–K are attached to the plaintiff's memorandum of law without any affidavit accompanying them. Attaching exhibits in support of the motion to a memorandum of law is improper. As no affidavit accompanied Exhibits A–K, they cannot be considered by the Court on this motion.

Additionally, the plaintiff failed to adhere to the requirement of Local Civil Rule 37.1 because it did not specify and quote or set forth verbatim in the motion papers each discovery request and responses to which the motion is addressed and set forth the grounds upon which it is entitled to prevail as to each request or response. Moreover, the plaintiff contends in its reply that its "attorneys are entitled to the fees and costs expressed in the attached *Reply Affirmation of Counsel.*"Although a copy of the plaintiff's reply submitted to the Court pursuant to Rule 2B of the Court's Individual Rules of Practice, without being marked as a courtesy copy as required by that rule, contained a one-page document styled "Reply Affirmation" by TJ Morrow, dated June 9, 2014, that document was neither filed nor served on the defendant. The plaintiff's motion, riddled with procedural deficiencies, warrants the motion's denial on procedural ground, especially in light of the plaintiff's failure to certify that, in good faith, it conferred or attempted to confer with the defendant in an effort to obtain disclosure or discovery without court action.

### Merits of Rule 37 Motion

**\*6** Notwithstanding the procedural deficiencies of the plaintiff's motion, upon consideration of the entirety of the plaintiff's submission on the motion and for the sake of efficiency and to avoid wasting judicial and the parties' resources, see Fed.R.Civ.P. 1, the motion is also denied on the ground that it is meritless. The defendant answered the plaintiff's first request for production of documents, making specific objections and responses to each request, including that: (a) "BRJ has never been involved in any transaction with Dorchester and accordingly, no such documents ever existed" (Request No. 1); (b) 'BRJ states that it has no responsive documents in its possession,

custody and control" (Request No. 2); (C) 'BRJ states that it has no documents concerning Luis Alcazar in its possession, custody or control other than documents previously provided" (Request No. 3); (d) 'no responsive documents exist other than those that Dorchester's counsel has provided to BRJ or BRJ's counsel" (Request No. 4); (e) 'BRJ has never been involved in any letter of credit or other transaction with Dorchester, whether involving Chase, SWIFT, other third-parties or otherwise, and accordingly, no such communications or documents related thereto ever existed" (Request No. 6); and (f) 'BRJ has never been involved in any transaction with Dorchester, ACP or any other entity relating to the subject matter of this action and, accordingly, no such documents ever existed."The plaintiff failed to specify, with respect to each of its requests, how the defendant failed to comply with its discovery obligations. The plaintiff contends that the following forms the basis for its belief that the defendant has documents that it failed to produce: (a) the October 13, 2003 letter to the court in the prior action by SWIFT's counsel; and (b) Baker's June 5, 2014 declaration.

The October 13, 2003 letter of SWIFT's counsel to the court has not been filed in the previous action by the plaintiff against SWIFT, No. 02 Civ. 7504, or in this action prior to this motion, and it is inadmissible on this motion as improperly attached to the plaintiff's memorandum of law without any affidavit. As such, the October 13, 2003 letter of SWIFT's attorney to the court is dehors the record in this case and in the previous case. Even when considered, the October 13, 2003 letter of SWIFT's counsel to the court does not contain, as the plaintiff contends, any admission that: (i)the SWIFT message contained the text of the letter of credit numbered "BBRRJLC449977810" which is referenced in the SWIFT message"; or (ii) 'SWIFT sent the message on Banco's behalf to Chase Manhattan Bank."The plaintiff's argument that the defendant must be compelled to produce "documents that Mr. Blackman reviewed that enabled him to draft and sign his October 13, 2003 letter" is absurd on its face because SWIFT's counsel is not the defendant's counsel, and the plaintiff failed to show why and how the defendant would know what documents, if any, SWIFT's counsel reviewed in preparing his October 13, 2003 letter to the court on behalf of his client. Moreover, what documents SWIFT's counsel reviewed to prepare the October 13, 2003 letter to the court on behalf of SWIFT appears to be a matter implicating SWIFT's work-product protection and SWIFT's attorney-client privilege. The plaintiff does not explain the basis for believing that the defendant could be privy to such

seemingly privileged and confidential information. Thus, the October 13, 2003 letter of SWIFT's counsel to the court in the prior action is not evidence supporting the plaintiff's contention that documents exist that the defendant failed to produce.

**\*7** Baker's declaration does not show that documents exists that the defendant failed to produce. Baker, "the banker assigned to Dorchester Financial Securities, Inc .... at the Chase Manhattan Bank," in October 2001, does not state, as the plaintiff contends in its memorandum of law, that she is a "former Chase Manhattan vice-president." Paragraph Nos. 6, 9 and 10 of Baker's declaration contain inadmissible hearsay because they contain information about what Baker "was told" by an unidentified party. Thus, all that Baker's declaration states is that, on or about October 22, 2001, she "secured in my possession a 2–page document from the Chase Manhattan Bank Communication Department," which she "handed ... to Mr. Morrow." Although she states that the document attached to her declaration "is an authentic Chase Manhattan Bank document" which she "retrieved and handed to Mr. Morrow in October 2001," no explanation is provided, based on personal knowledge by Baker or anyone else, about the content of that document or the meaning of any letters, numbers, words or symbols contained therein. After Baker stated that she "secured in my possession a 2–page document from the Chase Manhattan Bank Communications Department," without explaining what it means "to secure" in one's possession, she then stated that: (i) she "told Mr. Morrow that I had found the document he had requested," without explaining where or how she found it; and (ii) Exhibit A is "the same document that I retrieved," without explaining from where she retrieved it. Thus it is not clear whether Baker "secured in my possession," "had found" or "retrieved" the document that is attached as Exhibit A to her declaration, all of which phrases have different meanings pertinent to the source of the document at issue and its authenticity. Most importantly, Baker failed to explain the basis for her statement that Exhibit A, attached to her declaration, "is an authentic Chase Manhattan Bank document."The document attached to Baker's declaration as Exhibit A contains the word "caution" eight times and, inter alia, the following text: (1) "THIS MESSAGE WAS RECEIVED UNAUTHENTICATED"; (2) "IF AUTHORIZATION IS REQUIRED–DO NOT PROCESS"; (3) "UNDER NO CIRCUMSTANCES SHOULD A FINANCIAL BEARING TRANSACTION BE PROCESSED IN RESPONSE TO THIS MESSAGE"; and (4) "CONTACT COMMUNICATIONS DEPARTMENT-

(121/ 623–1130 IF AUTHORIZATION IS REQUIRED OR YOU HAVE QUESTIONS."No explanation is provided by Baker about the content of Exhibit A, except what is contained in inadmissible hearsay. Baker claims that she was "the banker assigned to Dorchester Financial Securities Inc .... at the Chase Manhattan Bank" in "October 2001," without any description of her duties and responsibilities or in what department she was employed, or any description of bank procedures in handling messages from one bank to another, that would establish that she has personal knowledge of the relevant facts in her declaration. That Baker was "the banker assigned to Dorchester Financial Securities Inc .... at Chase Manhattan Bank" is insufficient, without more, to establish that Baker had personal knowledge, if any, related to Exhibit A. Thus, Baker's declaration is not evidence supporting the plaintiff's contention that documents exist that were not produced by the defendant.

 **\*8** The plaintiff's assumption that documents exist that the defendant failed to produce is baseless. "Defendant is only required to produce documents that exist."*Barton Group, Inc. v. NCR Corp.,* No. 08 Civ. 5679(GEL)(FM), 2009 WL 6509348, at \* 1 (S.D.N.Y. July 22, 2009). The defendant responded to the plaintiff's document requests by stating that: (a) documents never existed (Request Nos. 1, 4, 6 and 12); (b) no responsive documents were found (Request Nos. 2, 4, 7, 11 and 14); (c) the request is overly broad, ambiguous and vague and seeks irrelevant information (Request Nos. 2, 5, 8, 11, 13, 15, 16); and (d) documents were produced or will be produced (Request Nos. 3, 9, 10, 13, 15, 16). The Court cannot compel production of documents the plaintiff represented do not exist, without any evidence to the contrary. Upon review of each document request by the plaintiff and the defendant's response to it, the objections that certain requests are overly broad, ambiguous and vague and seek irrelevant information are sustained. The plaintiff failed to address each specific objection by the defendant and explain why it believes certain requests are not overly broad, ambiguous, vague and seek irrelevant information. As an illustrative example, the plaintiff's request No. 5 seeks: "All communications BBT (Branch Banking & Trust) its U.S. correspondent from January 1, 2001 to the present."The plaintiff did not explain the relevance, if any, of this request, why the request is not overly broad in scope

and time, or why it is not ambiguous and vague or irrelevant. Thus, the plaintiff failed to carry its burden of showing that the defendant failed to disclose any documents. Accordingly, the plaintiff's motion to compel is denied on the merits.

### *Attorney's Fees*

If a motion under Rule 37"is denied, the court ... must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party ... its reasonable expenses incurred in opposing the motion, including attorney's fees. But the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust.

   Fed.R.Civ.P. 37(a)(5)(B).
The Court finds that the plaintiff's motion was not substantially justified because it was baseless and contained an argument unsupported in fact and in law, namely, that the defendant must produce what does not exist. No other circumstances make an award of expenses unjust. Accordingly, the defendant is entitled to reasonable attorney's fees, pursuant to Fed.R.Civ.P. 37(a)(5) (B), from the plaintiff and its attorney, Morrow.

### *Conclusion*
For the forgoing reasons, the plaintiff's motion, Docket Entry No. 75, is denied. It is ORDERED that:

   (1) on or before July 11, 2014, the defendant file evidence of its reasonable attorney's fees;

   (2) on or before July 18, 2014, the plaintiff file any challenge to the reasonableness of the defendant's attorney's fees; and

   **\*9** (3) on or before July 23, 2014, the defendant file any reply.

SO ORDERED:

### All Citations

Slip Copy, 2014 WL 3747160

---

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 3109868
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

GEARBOX SOFTWARE, LLC, Plaintiff,
v.
APOGEE SOFTWARE, LTD. and Interceptor
Entertainment, APS, Defendants.

No. 3:14–cv–710–L.   |   Signed July 8, 2014.

**Attorneys and Law Firms**

Michael E. Schonberg, Megan Dredla Hoyt, William Mayer Katz, Jr., Thompson & Knight, Dallas, TX, for Plaintiff.

George R. Schultz, Nicole Risher Marsh, Schultz & Associates, Michael E. Schonberg, Megan Dredla Hoyt, William Mayer Katz, Jr., Thompson & Knight LLP, Dallas, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER*

DAVID L. HORAN, United States Magistrate Judge.

**\*1** Defendant Interceptor Entertainment, ApS ("Interceptor") filed a Motion For Protective Order requesting the Court quash the deposition notices of Interceptor and its president, Frederik Schreiber, and enter a protective order requiring that the depositions take place in Aalborg, Denmark. *See*Dkt. No. 26.United States District Judge Sam A. Lindsay referred the motion to the undersigned magistrate judge for hearing, if necessary, and determination.Dkt. No. 27.Plaintiff Gearbox Software, LLC ("Gearbox") filed a response on July 7, 2014 [Dkt. No. 29], and Interceptor filed a reply brief on July 8, 2014 [Dkt. No. 30]. For the reasons explained below, Interceptor's motion for protective order [Dkt. No. 26] is GRANTED.

**Background**

On May 6, 2014, Interceptor filed a motion to dismiss for lack of personal jurisdiction. *See*Dkt. No. 14.Plaintiff filed an unopposed motion seeking limited discovery of jurisdictional

issues, which Judge Lindsay granted on May 15, 2014. *See* Dkt. Nos. 17 & 18.

Gearbox then served deposition notices for Schreiber and Interceptor for July 10 and July 11, 2014 at the offices of Gearbox's counsel in Dallas, Texas. *See*Dkt. No. 26–1 at 7–14.In response, Interceptor filed this request for a Federal Rule of Civil Procedure 26(c) protective order to require that the depositions take place in person or by Skype from Aalborg, Denmark, Interceptor's principal place of business.

**Legal Standards**

Under Rule 26(c), the Court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense. *See*FED. R. CIV. P. 26(c)(1). The Court has broad discretion to determine the appropriate place for examination. *See Resolution Trust Corp. v. Worldwide Ins. Mgmt. Corp.,* 147 F.R.D. 125, 127 (N.D.Tex.1992)."The deposition of a corporation by its agents and officers should ordinarily be taken at its principal place of business, especially when ... the corporation is the defendant."*Salter v. Upjohn Co.,* 593 F.2d 649, 651 (5th Cir.1979) (citation and internal quotation marks omitted); *see also Resolution Trust Corp.,* 147 F.R.D. at 127. This presumption is based on the concept that it is the plaintiff who brings the lawsuit and who exercises the first choice as to the forum. *See Tailift USA, Inc. v. Tailift Co., Ltd .,* No. 3:03–cv–196–M, 2004 WL 722244, at *1 (N.D.Tex. Mar.26, 2004). Courts have determined that this presumption satisfies the Rule 26(c) requirement of good cause. *See id.*(citing cases).

"A party may overcome the presumption, however, by showing that peculiar circumstances justify conducting the deposition at a location other than the corporation's principal place of business."*Id.* at *2 (citing *Salter,* 593 F.2d at 652). In *Resolution Trust Corp.,* the Court enumerated five factors for the Court to consider when determining whether sufficient circumstances are shown to overcome the presumption: "1. counsel for the parties being located in the forum district; 2. plaintiff seeking to depose only one corporate representative; 3. defendant choosing a corporate representative that resides outside the location of the principal place of business and the forum district; 4. significant discovery disputes that may arise and the anticipated necessity of the resolution by the forum court; and 5. the claim's nature and the parties' relationship such that 'an appropriate adjustment of the equities favors a deposition site in the forum district.' " *Resolution Trust Corp.,*

147 F.R.D. at 127 (quoting *Turner v. Prudential Ins. Co.,* 119 F.R.D. 381, 383–84 (M.D.N.C.1988)). The Court concluded that it "must ultimately consider each case on its own facts and the equities of the particular situation." *Id.*

## Analysis

**\*2** The Court determines that Gearbox has failed to overcome the presumption that Interceptor's corporate representatives, including Frederik Schreiber, should be deposed at its principal place of business in, or by Skype from, Aalborg, Denmark. Although all counsel of record are located in Dallas, " 'the convenience of counsel is less compelling than any hardship to the witnesses.' *Tailift,* 2004 WL 722244, at \*2 (quoting *Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 203 F.R.D. 98, 108 (S.D.N.Y.2001)). Plaintiff seeks to depose more than one corporate representative, *see* Dkt. No. 26–1 at 7–14, and each of Interceptor's five employees—including all corporate representatives—reside in Denmark, *id.* at 24–25. Although Gearbox urges that significant discovery disputes "may arise," Dkt. No. 29 at 9–10, there have been no previous discovery disputes presented to the Court in this case, and " 'the mere possibility of such disputes does not necessarily weigh in favor of conducting the deposition here.'" *Tailift,* 2004 WL 722244, at \*3 (citing *Rapoca Energy Co. v. Amci Export Corp.,* 199 F.R.D. 191, 193 (W.D.Va.2001)). Moreover, the nature of the discovery sought—which involves personal jurisdiction over Interceptor—suggests that Denmark is an appropriate forum for the deposition to take place.

Gearbox contends that peculiar circumstances justify deposing the witnesses in Dallas, since Interceptor and its president have significant contacts with Dallas and Danish law may impede the taking of depositions in Denmark and impose "hurdles ... foreclos[ing] cheaper alternatives that may exist." Dkt. No. 29 at 5–7, 12. The Court does not agree that Schreiber's contacts to Dallas, as set forth by Gearbox and Interceptor, constitute peculiar or special circumstances that justify departure from the normal rule that the party seeking discovery must go where the desired witnesses are located. Even accepting Gearbox's contentions as true, the fact that a corporate representative has traveled to Dallas once per year since 2011 and has "contracted with companies or individuals in the State of Texas at least four times in the past two years," *id.* at 6, does not establish a special circumstance that justifies conducting the deposition at a location other than the

corporation's principal place of business. *See Tailift,* 2004 WL 722244, at \*3 ("[T]he fact that [the deponent] has traveled to the United States only seven times since 1998, and only for a few days each time, hardly presents a frequency of presence in the United States that weighs in favor of overcoming the presumption.")

The Court also does not believe that Gearbox's concerns about the effect of Danish law justify subjecting Interceptor and its president to the expense and disruption of traveling to Dallas for a deposition. The State Department Advisory provided by Gearbox, which reports that "[v]oluntary witnesses deposed outside Danish courtrooms cannot be prosecuted under Danish law for perjury" and "[t]elephone depositions are not permitted" under Danish law, *see* Dkt. No. 29–1 at 12, does not establish that Danish law will hamper these depositions from taking place in Denmark or by Skype. Interceptor has represented that the deposition may indeed occur in Denmark or by Skype from Denmark, that Schreiber and another corporate representative will appear voluntarily, and that depositions by phone are legal and binding in Denmark. *See* Dkt. No. 30 at 2–3; Dkt. 30–1 at 29–35. If Interceptor changes its position on this point, or the Danish laws present impediments to obtaining discovery under Federal Rule of Civil Procedure 28(b), Gearbox may return to this Court for redress. *See United States v. One Gulfstream G–V Jet Aircraft Displaying Tail Number VPCES, Its Tools & Appurtenances,* No. 11–01874(RC), ––––F.R.D. ––––, 2014 WL 1871342, at \* 6 (D.D.C. May 9, 2014).

**\*3** And this Court, not Danish law, determines whether evidence taken in discovery is admissible, and this Court retains the power to order a litigant from whom discovery is sought, and who is subject to *in personam* jurisdiction, to produce evidence on pain of sanctions. *See Societe Nationale Industrielle Aerospatiale v. United States Dist. Ct.,* 482 U.S. 522, 539–40, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987) (holding the Hague Convention did not deprive the district court of the jurisdiction that it otherwise possessed to order a foreign national party before it to produce evidence physically located within a signatory nation).

The Court therefore finds that Gearbox has failed to overcome the presumption that Interceptor's corporate representatives should be deposed at its principal place of business in Aalborg, Denmark or by Skype from Denmark. The Court finds that the notices of deposition in Dallas subject Interceptor to "annoyance, embarrassment, oppression, or

undue burden or expense" under Rule 26(c)(1) and should be quashed.

## Conclusion

The Court GRANTS Interceptor's Motions For Protective Order [Dkt. No. 26] and QUASHES the deposition notices of Interceptor and its president, Frederik Schreiber.

SO ORDERED.

**All Citations**

Slip Copy, 2014 WL 3109868

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1821700
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
San Antonio Division.

Moeineddin GHAVAMI, Plaintiff,

v.

Juan ALANIS and Jose Ledesma, individually and
in their official capacities as Bexar County Detention
Center guards, and Several Unknown Bexar County
Detention Center Guards, individually and in their
official capacities as Bexar County Detention Center
Guards, and Bexar County, Texas, Defendants.

No. Civ.A.SA-05-CV0700RF.   |   June 29, 2006.

**Attorneys and Law Firms**

James C. Harrington, Scott Medlock, Wayne Krause, Texas
Civil Rights Project, Austin, TX, for Plaintiff.

Charles Straith Frigerio, Attorney at Law, Laurence S. Kurth,
Clark, Thomas & Winters, P.C., Lori W. Hanson, Sue
Ann Gregory, Bexar County District Attorney's Office, San
Antonio, TX, for Defendants.

***ORDER DENYING MOTION
TO COMPEL (Docket entry 109)***

NANCY STEIN NOWAK, Magistrate J.

**\*1** The matter before the Court is defendant Ledesma's
motion to compel informal discovery, plaintiff's response,
defendant's reply and plaintiff's sur-reply (docket entries 109,
111, 131, and 133).

By his motion defendant asks the court to compel plaintiff
to permit defendant to contact medical personnel by signing
HIPAA authorizations. Plaintiff objects and insists that
defendant use formal means of discovery to acquire the
information.

Clearly, the information sought by defendant is relevant
to this dispute. However, defendant has cited no rule
of procedure or case authority which would authorize
the court to compel the informal discovery process. In
lieu of agreement, defendant may utilize formal requests
for production, deposition notices and Rule 45 subpoena
processes ... but the rules do not require opposing counsel to
agree to the requested authorizations nor empower this court
to compel the authorizations.

It is therefore ORDERED that the motion to compel is
DENIED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1821700

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5306961
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Tyler Division.

Motion Games, LLC, Plaintiff,

v.

Nintendo Co., Ltd.; et al., Defendants.

Cause No. 6:12–cv–878–
JDL   |   Signed October 16, 2014

**Attorneys and Law Firms**

Darrell Glyn Dotson, The Dotson Law Firm, Longview, TX, David Michael Underhill, Patrick Michael Lafferty, Richard S. Meyer, Boies Schiller & Flexner LLP, Michael A. O'Shea, Hunton & Williams DC, Rachael R. Yocum, Hunton & Williams, LLP, Washington, DC, Joshua Mark Kalb, Hunton & Williams, Atlanta, GA, Sona Rewari, Hunton & Williams, McLean, VA, Gregory Phillip Love, Love Law Firm PC, Henderson, TX, for Plaintiff.

Brian D. Roche, Jennifer Yule Depriest, Vanessa Marti Heftman, Reed Smith LLP, Chicago, IL, Barry J. Coyne, Reed Smith, Pittsburgh, PA, Debra Elaine Gunter, Findlay Craft PC, Herbert A. Yarbrough, III, Attorney at Law, Tyler, TX, Joseph S. Presta, Nixon & Vanderhye PC, Arlington, VA, Jennifer Haltom Doan, Christy Lynn Samansky, Haltom & Doan, Texarkana, TX, for Defendant.

*MEMORANDUM OPINION AND ORDER*

**JURY TRIAL DEMANDED**

JOHN D. LOVE, UNITED STATES MAGISTRATE JUDGE

**\*1**  Before the Court is Motion Games, LLC's ("Motion Games") Motion to Compel Nintendo Corporation, Ltd. ("NCL") to Produce Its Witnesses in the United States (Doc. No. 209) ("MOTION"). NCL filed a response in opposition to the motion (Doc. No. 217) ("RESPONSE"), Motion Games filed a reply ("REPLY") (Doc. No. 219), and NCL filed a sur-reply ("SUR–REPLY") (Doc. No. 222). Having considered the applicable law, the briefs by both parties, and the relevant evidence, the Court finds that Motion Games' motion should be **DENIED.**

*BACKGROUND*

NCL is headquartered in Kyoto, Japan and is a corporation organized under the laws of Japan. (Doc. No. 217–1, at ¶ 2). NCL's Integrated Research and Development Division was mainly responsible for the design and development of the accused Wii system and is located in Japan. (Doc. No. 34–30, ¶ 4). NCL's employees are also responsible for the design and testing of the Wii console and the development of all Nintendo hardware systems and all Nintendo software for the Wii console. These activities are primarily performed at Nintendo's headquarters in Kyoto, Japan. *Id.* In its discovery responses and disclosures in this litigation, NCL identified potential witnesses who work at NCL's headquarters in Kyoto, Japan. All of the identified potential witnesses reside in Japan, and their employment "revolves around NCL's headquarters in Japan." *Id.* at ¶ 4.

All depositions in Japan must occur at the U.S. Consulate in Tokyo or Osaka and follow applicable Japanese regulations. The U.S. Consulate of Japan informs prospective attorneys:

> Taking a deposition in Japan can be complex; depositions are controlled by detailed agreements between the United States and the Government of Japan, and procedures cannot be modified or circumvented. Orders by U.S. courts cannot compel the Government of Japan to amend or overlook its judicial regulations and procedures. In addition, the Embassy cannot compel the Government of Japan to act faster, or in a way more convenient or beneficial to any party, even with a U.S. court order requesting such action.

Parties must follow *inter alia* the below rules when conducting a deposition in Japan:

- At least six weeks before the deposition, the Consulate must receive an original certified copy of a District Court order commissioning the deposition;

- Once the Court enters the commission, each non-Japanese citizen attending the deposition must secure a special deposition visa.

• Only the individuals specifically identified in the Court's commission are eligible for a deposition visa, or even entry into the deposition room.

• Only two deposition rooms are available in Osaka, and are subject to availability.

• The deposition rooms are only available each day from 9–12:30 and 1:30–5:00 (7 hours total).

• Any electronic equipment brought to the deposition must be pre-approved by the Consulate at least two weeks in advance, and wireless or Bluetooth communication is prohibited. Pre-approval of an electronic device requires sending the make, model, and serial number of each device.

**\*2** • Cell phones are strictly prohibited.

(Doc. No. 217–5); *Depositions in Japan,* Embassy of the United States: Tokyo, Japan (October 16, 2014, 11:50 AM), http:// japan.usembassy.gov/e/acs/tacs-7116.html.

Motion Games served its first notices of deposition on July 2, 2014 and proposed Dallas, Texas as the location. On July 30, Motion Games amended its 30(b)(6) notices and changed the location of all the depositions to Seattle, Washington. On August 7, in response to Motion Games' first 30(b)(6) deposition notice, NCL stated, "NCL objects to the proposed location for this deposition as improper and unduly burdensome, as it has been noticed at a location other NCL's principal place of business ... NCL will produce its corporate representatives at a United States consulate in Osaka, Japan." (Doc. No. 209–3, at ¶ 1) (internal citations omitted).

On September 3, Motion Games served its second amended custodial depositions and proposed Tyler, Texas as the location for the deposition. (Doc. No. 209–4). Motion Games then proposed Seattle or Redmond, Washington as an alternative location. On September 12, Motion Games proposed taking the depositions of the NCL witnesses located in Japan "anywhere in the U.S. mainland or Hawaii." (Doc. No. 209–8). Motion Games has also offered to pay for half of the witnesses' airfare.

NCL scheduled and paid the required deposit for the depositions to be held at the U.S. Consulate in Osaka, Japan for the week of November 10, 2014. On September 22 counsel for NCL advised counsel for Motion games that the

U.S. Consulate in Osaka had confirmed availability for the depositions scheduled for the week of November 10 and that the reservation would remain open while this motion was pending. Motion Games has not attempted to arrange depositions in Japan. NCL has yet to designate witnesses to testify on its behalf.

### *LEGAL STANDARD*

"It is well settled that '[t]he deposition of a corporation by its agents and officers should ordinarily be taken at its principal place of business,' especially when ... the corporation is a defendant." *Salter v. Upjohn Co.,* 593 F.2d 649, 651 (5th Cir.1979) (internal citations omitted). "This presumption is based on the concept that it is the plaintiff who brings the lawsuit and who exercises the first choice as to the forum." *Tailift USA, Inc. v. Tailift Co.,* No. Civ.A.3:03–CV–0196–M., 2004 WL 722244, at \* 1 (N.D.Tex. Mar. 26, 2004) (citing *Payton v. Sears, Roebuck & Co.,* 148 F.R.D. 667, 669 (N.D.Ga.1993)). However, a party may persuade the court to permit the deposition elsewhere by showing that "peculiar" or "extraordinary" circumstances exist. *See Salter,* 593 F.2d at 652.

Among the factors analyzed in determining whether such "peculiar circumstances" exist are: (1) whether the parties' counsel are located in the forum district, (2) the number of corporate representatives the plaintiff seeks to depose, (3) whether the defendant has chosen a corporate representative that lives outside the principal place of business and forum district, (4) the likelihood of significant discovery disputes that require the court's resolution, (5) whether the deponents often travel for business purposes, and (6) the equities related to the nature of the claim and the parties' relationship. *Mediatek, Inc. v. Sanyo Electric Co. Ltd.,* No. 6:05 CV 323, 2006 WL 5709449, at \*1 (E.D.Tex. Aug. 9, 2006), *Cadent Ltd. v. 3M Unitek Corp.,* 232 F.R.D. 625, 628 (C.D.Cal.2005); *Resolution Trust Corp. v. Worldwide Ins. Mgmt. Corp.,* 147 F.R.D. 125, 127 (N.D.Tex.1992).

**\*3** When considering the equities related to the nature of the claim and the parties' relationship, courts often look at whether the time, expense, and inconvenience of travel present special hardship for the deponent and the ability of the court to intervene should disputes arise. Some courts find these factors to be "the more significant factors." *New Medium Techonologies LLC v. Barco N.V.,* 242 F.R.D. 460, 467 (N.D. Ill 2007) (citing *Afram Export*

Case 3:14-cv-00285 Document 100-1 Filed in TXSD on 08/27/15 Page 14 of 51
Motion Games, LLC v. Nintendo Co., Ltd., Not Reported in F.Supp.3d (2014)
2014 WL 5306961

*Corp. v. Metallurgiki Halyps, S.A.,* 772 F.2d 1358, 1365 (7th Cir.1985); *Custom Form Mfg. v. Omron Corp.,* 196 F.R.D. 333, 336 (N.D.Ind.2000); *In re Honda American Motor Co., Inc. Dealership Relations Litigation,* 168 F.R.D. 535, 538 (D.Md.1996)); *see also Mediatek,* 2006 WL 5709449, at *2.

### ANALYSIS

Motion Games argues that taking depositions in the United States would increase the efficiency, fairness, and cost-effectiveness of conducting discovery in this case. Motion Games states that "the policies of Japan and the consulate create an arcane and restrictive process that [ ] stifles discovery and increases expenses." MOTION at 6. In particular, Motion Games objects to the lack of flexibility as to attorneys, translators, court reporters, and potential witnesses that Motion Games learns of during the depositions. MOTION at 6–7. Motion Games also notes that the time difference and the prohibition of calls from the consulate preclude the court from effectively being able to intervene during any discovery dispute. Furthermore, Motion Games contends that disputes are likely in light of defendants' "on-going attempt to obfuscate and delay discovery" and NCL's adoption of "unreasonably narrow interpretations of numerous topics." *Id.*; REPLY at 2.

NCL argues that Motion Games fails to show peculiar or extraordinary circumstances exist, and, therefore, Motion Games has failed to overturn the presumption that corporate representative witnesses be deposed at or near its principal place of business. NCL contends that requiring its employees to travel to Hawaii or Washington for a deposition would place the convenience of plaintiff's counsel above that of the defendant's witnesses. NCL further argues that any scheduling difficulties that arise from the rules of depositions in Japan are largely the result of Motion Games' failure to plan appropriately. They contend that Motion Games' arguments could be applied to any case involving a foreign corporate defendant, and, as such, compelling these depositions to take place in the United States would "eviscerate the general, settled rule." RESPONSE at 12.

The circumstances of this case are not peculiar or extraordinary as to permit a departure from the general rule that a corporation's designees be deposed at or near the corporation's principal place of business. *Salter,* 593 F.2d at 651. Motion Games notes that there is a fourteen-hour time difference between Tyler, Texas and Osaka, Japan. The vastly

different time zones certainly eliminate the availability of the discovery hotline and hinder the Court's resolution of disputes that may arise during discovery. However, "courts have held that plaintiffs normally cannot complain if they are required to take discovery at great distances from the forum." *Fawquhar v. Sheldon,* 116 F.R.D 70, 72 (E.D.Mich.1987). As such, the time difference is not sufficient to justify a departure from the general rule because such a finding would allow plaintiffs to require nearly all foreign witnesses to be deposed in the United States.

**\*4** Motion Games' argues that the circumstances of this case are "peculiar" because NCL, based on its actions in the present litigation, will likely obstruct discovery or that disputes are likely. RESPONSE at 2. This argument is unconvincing and it fails to take into account the availability for subsequent court-ordered remedies. First, Motion Games does not support its contention that NCL has adopted unreasonably narrow interpretations of numerous topics. Second, while it is true that the defendants argued and pursued legal strategies for staying the case pending *inter partes* review and relocating venue, these motions, although ultimately unsuccessful, had a valid legal basis. [1] As such, Motion Games' attempt to equate these strategies with bad faith or dilatory tactics during discovery is unpersuasive.

[1]    Although NCL's previous motions are considered separate from the instant motion, the Court notes that defendants have repeatedly moved to stay, transfer, reconsider, or otherwise interrupt or delay the progress of the litigation. The Court cautions the defendants that, at some point, these repetitive motions may appear to be obstructionist.

In sum, Motion Games' contends that taking depositions in Japan will be difficult and expensive for Motion Games' counsel due to the distance and rigid requirements of Japanese law. As such, Motion Games, in essence, asks the Court to find that deposing corporate representative witnesses in Japan is *per se* peculiar or extraordinary. Although the costs of holding depositions in Japan are high and the rules are rigid, Motion Games could have—and still can—mitigate these concerns with proper planning. Thus, the Court finds that peculiar or extraordinary circumstances do not exist in this cause, and, therefore, will not depart from the general rule that corporate representative witnesses should be deposed in or near the corporation's principle place of business.

Case 3:14-cv-00285   Document 100-1   Filed in TXSD   on 08/27/15   Page 15 of 51

### ORDER

The circumstances of the present litigation do not justify a break from the general rule. Accordingly, Motion Games' Motion to Compel Defendant NCL to Produce Its Witnesses in the United States (Doc. No. 209) is **DENIED.**

In denying the present motion, the Court is mindful of the deadlines set forth in the Docket Control Order and the time and expense of deposing witnesses in Japan. As such, the Court expects that NCL will not delay in designating witnesses and that those witnesses will be prepared for the depositions. If NCL's witnesses are unprepared for the depositions or the completion of the depositions within the allotted time is frustrated by improper obstruction or delay, NCL risks an order to pay Motion Games' costs, an order to extend the discovery deadline, an order for supplemental 30(b)(6) depositions to be produced within the United States, or additional appropriate remedies.

**So ORDERED and SIGNED this 16th day of October, 2014.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 5306961

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 67221
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Joel ROSS, Ross Properties, Inc., and
Citadel Realty Group, LLC, Plaintiffs,
v.
UKI LTD., Tonex Holdings Ltd., Jacob Schimmel,
Marc Schimmel and Harold Schimmel, Defendants.

No. 02 Civ. 9297(WHP)JCF.   |   Jan. 15, 2004.

**Synopsis**

**Background:** Real estate broker and his two brokerage agencies brought action against various business entities and individuals, seeking to recover commissions on series of real estate transactions.

**Holdings:** On broker's motion for order compelling discovery, the District Court, James C. Francis, United States Magistrate Judge, held that:

[1] presence of financial services contractor and accountant at meeting at which counsel gave corporate client legal advice about the tax consequences of proposed real estate transactions did not waive attorney-client privilege under New York law;

[2] attorney-client privilege was not waived under New York law with regard to attorney's e-mails and letters discussing corporate client's proposed real estate transactions; and

[3] relationships among various defendants were discoverable.

Motion granted in part and denied in part.

West Headnotes (8)

[1]    **Privileged Communications and
       Confidentiality**
           👉 Particular cases

Documents reflecting attorney communications made predominately for the purpose of giving legal advice were protected by attorney-client privilege under New York law; although business aspects of underlying transactions were discussed, such discussion was necessary to provide context for providing legal opinions.

1 Cases that cite this headnote

[2]    **Privileged Communications and
       Confidentiality**
           👉 Agents or employees of attorney or client in
           general
       **Privileged Communications and
       Confidentiality**
           👉 Accountants and auditors
       **Privileged Communications and
       Confidentiality**
           👉 Waiver of privilege

Presence of financial services contractor and accountant at meeting at which counsel gave corporate client legal advice about the tax consequences of proposed real estate transactions did not waive attorney-client privilege under New York law with regard to document summarizing the meeting; contractor was present as necessary adjunct to client and its asset manager in the transactions, and accountant was present as representative of accounting firm that had regularly provided tax accounting services for client and was regularly included in discussions with counsel.

Cases that cite this headnote

[3]    **Privileged Communications and
       Confidentiality**
           👉 Waiver of privilege

Attorney-client privilege was not waived under New York law with regard to attorney's e-mails and letters discussing corporate client's proposed real estate transactions, where privileged communication was not disseminated beyond counsel and client representatives.

Cases that cite this headnote

**[4]**   **Privileged Communications and Confidentiality**

👉 Waiver of privilege

Attorney did not waive attorney-client privilege under New York law by sending e-mail concerning structuring of corporate client's proposed real estate transaction to director of client's real estate management services company; director's company acted as the functional equivalent of client's employees, and its participation in attorney-client discussions concerning the transaction was necessary in light of its role in structuring the deal.

2 Cases that cite this headnote

**[5]**   **Privileged Communications and Confidentiality**

👉 Criminal or other wrongful act or transaction; crime-fraud exception

Clients' creation of separate business entities exclusively for the purpose of engaging in specific real estate transactions did not show that documents containing attorneys' discussions of the transactions were made in furtherance of the crime of tax fraud, as required for crime/fraud exception to the attorney-client privilege to apply under New York law; it was appropriate for a party to seek to minimize its taxes and for counsel to provide advice on how to do so.

2 Cases that cite this headnote

**[6]**   **Federal Civil Procedure**

👉 Scope

Relevance for purposes of discovery is not limited to information directly supporting or contradicting the ultimate question in a case, narrowly formulated. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

Cases that cite this headnote

**[7]**   **Federal Civil Procedure**

👉 Scope

Relationships among various entities and individuals involved in series of real estate

transactions were discoverable in broker's action to recover commissions; such evidence was relevant to rebut claim that commitments made by one individual or entity could not be attributable to broker's client. Fed.Rules Civ.Proc.Rule 26(b)(1), 28 U.S.C.A.

Cases that cite this headnote

**[8]**   **Federal Civil Procedure**

👉 Particular Subject Matters

Documents relating to commissions paid by various entities and individuals to real estate broker were discoverable in broker's action to recover commissions on series of real estate transactions; documents were relevant because, to the extent such payments were based on authorizations similar to those communicated in connection with the contested transactions, and to the extent the services provided were similar, it would have supported broker's claims.

Cases that cite this headnote

---

*MEMORANDUM AND ORDER*

FRANCIS, Magistrate J.

**\*1** The plaintiffs in this action have moved pursuant to Rule 37 of the Federal Rules of Civil Procedure for an order compelling the defendants to produce documents withheld on the basis that they are not relevant or that they reflect privileged attorney-client communications. In a Memorandum and Order dated October 8, 2003, I deferred decision on the motion in order to give the defendants an opportunity to provide additional details concerning the basis for asserting the attorney-client privilege, to submit the disputed documents for an *incamera* review, and to respond to the plaintiffs' arguments regarding relevance. Counsel have supplemented the record as I requested, and, for the reasons set forth below, the plaintiffs' motion is granted in part and denied in part.

*Background*

**Ross v. Citadel, Not Reported in F.Supp.2d (2004)**
Case 3:14-cv-00285   Document 100-1   Filed in TXSD on 08/27/15   Page 18 of 51
2004 WL 67221

The plaintiffs in this action are Joel Ross, a licensed real estate broker in New York, and the two brokerage agencies through which he operates, Ross Properties, Inc. ("Ross Properties"), and Citadel Realty Group, L.L.C. ("Citadel"). (First Amended Complaint ("Compl.") ¶¶ 1, 2, 3). The defendants are Tonex Holdings Ltd. ("Tonex"), a holding company in Gibralter; UKI Ltd. ("UKI"), an English limited liability company with a principal place of business in London; and Harry Schimmel and his sons Jacob and Marc, each of whom resides in London. (Compl. ¶¶ 4–8; Declaration of Jacob Schimmel dated Aug. 11, 2003 ("Jacob Schimmel Decl.") ¶¶ 1, 3, 5). The defendants are engaged in the acquisition and development of real estate, primarily in the United Kingdom. (Compl. ¶ 11). Tonex is a holding company whose subsidiaries make the real estate investments and which, according to the Complaint, is controlled by the Schimmels. (Declaration of Maurice Moses Benady dated Aug. 11, 2003 ("Benady Decl.") ¶ 3; Compl. ¶ 11). UKI acts as asset manager for Tonex, and Jacob and Marc Schimmel are both directors of UKI. (Compl. ¶ 11; Benady Decl. ¶ 5).

The parties engaged in three series of transactions that gave rise to this action First, the plaintiffs allege that they procured for the defendants an arrangement they characterize as the Westbrook Brokerage Agreement. In November 1998, the Schimmels purportedly asked Mr. Ross and Ross Properties for assistance in obtaining financing for a series of real estate transactions to be conducted by the Schimmels and Tonex. (Compl. ¶ 13). In response, Mr. Ross helped negotiate a joint venture on behalf of the Schimmels and Tonex with Westbrook Partners L.L.C. ("Westbrook"), an opportunity fund. (Compl. ¶ 14). According to the plaintiffs, the Schimmels and Tonex agreed to pay Mr. Ross and Ross Properties 1% of the gross proceeds of certain transactions between the Schimmels and Tonex on one hand and Westbrook on the other. (Compl. ¶ 14). The Schimmels and Tonex then sold a group of properties to Westbrook for approximately $573 million. (Compl. ¶ 15). Mr. Ross and Ross Properties contend that they are therefore entitled to a commission of $5,730,000 on this transaction and that the defendants have refused to make payment. (Compl. ¶¶ 16, 17).

**\*2** The second transaction involved a purchase of real estate from The British Land Company, PLC ("British Land"). The plaintiffs allege that in 1999, the Schimmels and Tonex received a viable offer from Westbrook to finance their purchase of a portfolio of properties from British Land. (Compl. ¶ 18). The Schimmels and Tonex did not utilize Westbrook's financing, but they allegedly used the offer

as leverage to obtain better terms from a German bank. (Compl. ¶¶ 18, 19). On that basis, Ross and Ross Properties claim that they are entitled to a commission of $150,000. (Compl. ¶ 20).

The third transaction arose from a meeting in April 2000, when Mr. Ross, acting on behalf of Citadel, introduced Jacob Schimmel and Tonex to officers of GMAC Commercial Mortgage ("GMAC"). At that time, the Schimmels and Tonex purportedly agreed that Mr. Ross and Citadel would be entitled to 1% of any senior financing and 2% of any "mezzanine" financing obtained from GMAC. (Compl. ¶ 22). In October 2002, the Schimmels and Tonex were extended a loan of $200 million by GMAC, as a result of which the plaintiffs seek a commission of $2.1 million. (Compl. ¶ 23).

## Discussion

### A. Attorney–Client Privilege

During the course of discovery, the plaintiffs have propounded document requests to the defendants. In response, the defendants have withheld some documents on the basis of the attorney-client privilege and have objected to some requests on the ground that they do not seek relevant information. The plaintiffs argue that any potential privilege has been waived because the attorney-client communications were made in the presence of, or later disseminated to, third-parties. The defendants respond that these third-parties were their agents who were acting as the functional equivalent of their own employees, so that the sharing of attorney-client communications with them did not waive the privilege. Although the defendants initially withheld many more documents as privileged, the dispute now concerns only twelve.

Because subject matter jurisdiction in this case is based on diversity of citizenship, questions of privilege are governed by state law. Fed.R.Evid. 501. As the parties have treated New York law as controlling with respect to the substantive claims, that law applies to the privilege issues as well.

### 1. Nature of the Communications

[1]   In order for a communication to be privileged under New York law, it must, among other things have been made principally to assist in obtaining or providing legal advice or services for the client. People v. Osorio, 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 614, 549 N.E.2d 1183 (1989). Accordingly, simple business advice, even if provided by a

Ross v. Careter; Not Reported in F.Supp.2d (2004)
Case 3:14-cv-00285   Document 100-1   Filed in TXSD on 08/27/15   Page 19 of 51
2004 WL 67221

lawyer, is not privileged. See *Rossi v. Blue Cross and Blue Shield of Greater New York,* 73 N.Y.2d 588, 592–93, 542 N.Y.S.2d 508, 510, 540 N.E.2d 703 (1989). Nevertheless,

> [i]n pursuing large and complex financial transactions, commercial entities often seek the assistance of attorneys who are well equipped both by training and by experience to assess the risks and advantages in alternative business strategies. When providing this assistance, counsel are not limited to offering their client purely abstract advice as to the rules of law that may apply to their situation. Of necessity, counsel will often be required to assess specific tactics in putting together transactions or shaping the terms of commercial agreements, and their evaluation of alternative approaches may well take into account not only the potential impact of applicable legal norms, but also the commercial needs of their client and the financial benefits or risks of these alternative strategies. The fact that an attorney's advice encompasses commercial as well as legal considerations does not vitiate the privilege. If the attorney's advice is sought, at least in part, because of his legal expertise and the advice rests "predominantly" on his assessment of the requirements imposed, or the opportunities offered, by applicable rules of law, he is performing the function of a lawyer. *Rossi,* 73 N.Y.2d at 594, 542 N.Y.2d at 511. In such circumstances, the privilege should be recognized if all other elements are satisfied. *See, e.g., Stratagem Dev. Corp. v. Heron Int'l N.V.,* 153 F.R.D. 535, 543 (S.D.N.Y.1994).

**\*3** *Note Funding Corp. v. Bobian Investment Co., N.V.,* No. 93 Civ. 7427, 1995 WL 662402, at \*2–3 (S.D.N.Y. Nov.9, 1995).

Having reviewed the contested documents *incamera,* I find that each one reflects communications made predominately for the purpose of giving legal advice. Although business

aspects of the transactions are certainly discussed, this is clearly necessary to provide the context for providing legal opinions. The documents are therefore protected from discovery unless the privilege has been waived or an exception applies.

### 2. *Waiver*

#### a. *Legal Standard*
Under New York law, the voluntary disclosure of a privileged communication to a third party waives the privilege. See *National Education Training Group, Inc. v. Skillsoft Corp.,* No. M8–85, 1999 WL 378337, at \*3 (S.D.N.Y. June 10, 1999). However, "New York courts have recognized a narrow exception to this rule where privileged communications are shared with the client's agent." *Id.* In order to come within this agency exception and avoid waiver, the party asserting the privilege must meet a two-pronged test. First, it must demonstrate that the client had a " 'reasonable expectation of confidentiality under the circumstances .' ' *Id.* at \*4 (quoting *Osorio,* 75 N.Y.2d at 84, 550 N.Y.S.2d at 615, 549 N.E.2d 1183). Though a formal agency relationship is not required, the relationship between the client and the third party must be sufficiently close that the client's subjective expectation of confidentiality is reasonable. See *National Education Training Group,* 1999 WL 378337, at \*4. Second, the client "must establish that disclosure to a third party ... was necessary for the client to obtain informed legal advice." *Id.* (citations omitted). "[T]he 'necessity' element means more than just useful and convenient, but rather requires that the involvement of the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Id.*

#### b. *Application to the Contested Documents*
With these principles in mind, the assertion of privilege with respect to each of the contested documents can be analyzed.

#### (i) *May 15, 2001 Facsimile (Document 1)*
 **[2]**   The first document at issue is a facsimile transmission dated May 15, 2001, from David Birns summarizing a meeting held the day before. The meeting related to "Project Alliance" which was a group of potential transactions by which subsidiaries of Tonex would sell a portfolio of properties to Westbrook. (Supplemental Declaration of Alan A. Samson dated Oct. 31, 2003 ("Samson Decl.") ¶ 8). Part of the meeting concerned the structuring of the transactions,

and the portion of the document describing those discussions has been disclosed. The balance of the document concerns legal advice about the tax consequences of the transactions, and that portion has been withheld as privileged.

The "client" in these communications was Tonex, the holding company for the entities that would be the sellers in the various transactions. It was represented directly at the meeting by Maurice Moses Benady and Chris White who were directors of Tonex and who participated by telephone. (Benady Decl. ¶¶ 2, 4). Tonex was also represented by Jeffrey S. Cooper, an independent contractor who provided financial services for UKI. Because Tonex has no employees, it often utilizes UKI as its asset manager. (Benady Decl. ¶ 5). Mr. Cooper, in turn, is functionally the head of UKI's finance department: he works almost exclusively at UKI's offices, writes to third parties on UKI letterhead, and attends meetings on behalf of UKI. (Supplementary Declaration of Jeffrey S. Cooper dated Oct. 31, 2003 ("Cooper Supp. Decl.") ¶¶ 3, 4, 5). Mr. Cooper was a necessary adjunct to UKI and Tonex in this set of proposed transactions, and his participation in a meeting where legal advice was discussed therefore did not waive the privilege.

**\*4** Mr. Birns, who wrote the memorandum, and Jeffrey Kahan were present on behalf of Cohen Arnold & Co. ("Cohen Arnold"). Cohen Arnold has provided tax accounting services for Tonex and UKI since 1997, and prior to that for Harry Schimmel. (Supplemental Declaration of David Birns dated Oct. 30, 2003 ("Birns Supp. Decl.") ¶¶ 4, 5, 9). While Mr. Birns does work for other clients, he has a particularly close and continuous working relationship with UKI and Tonex and is regularly included in discussions with counsel. (Birns Supp. Decl. ¶¶ 5–8). The participation of the Cohen Arnold firm, then, as a representative of Tonex and UKI, was likewise necessary to the provision of legal advice.

Most of the other participants were attorneys. Alan Samson and Nicholas Alexander appeared for Gibson, Dunn & Crutcher ("Gibson, Dunn"), Tonex's primary counsel. (Benady Decl. ¶ 6; Samson Supp. Decl. ¶¶ 3, 4). Peter Kempster of the firm of Nabarro Nathanson also represented Tonex and UKI (Samson Supp. Decl. ¶¶ 8, 13), while Mortimer Rabin was Tonex's counsel in Israel and the firm of Ogier & Le Masurier represented it in Jersey in the Channel Islands. (Samson Supp. Decl. ¶¶ 8, 9).

The final participant in this meeting was Mark Morris, then a real estate consultant with the firm of Jones Lang LaSalle.

(Supplemental Declaration of Mark Morris dated Oct. 31, 2003 ("Morris Supp. Decl.") ¶ 3). Mr. Morris represented the purchaser in the transaction. However, he was excused from the meeting prior to the discussions of legal advice, and his presence therefore did not cause a waiver of the privilege.

As all of the participants in the portion of the May 14, 2001 meeting were either attorneys or necessary representatives of the clients, the communications in the redacted section of the May 15 memorandum remain privileged.

### (ii) *June 8, 2001 E–Mail (Document 2)*

**[3]** The next document is an e-mail dated June 18, 2001, from Nicholas Alexander of Gibson, Dunn concerning Project Alliance and relaying legal advice provided by Mr. Rabin. Most of the recipients were persons already identified above as client representatives or attorneys. In addition, the communication was sent to Richard Thomas who was a lawyer with Ogier & Le Masurier, Tonex's Jersey counsel. (Samson Supp. Decl. ¶ 12). It was also transmitted to Jacob and Mark Schimmel, who, as directors of UKI, were client representatives. Finally, a copy was sent to Anne L. Constantine, who was Mr. Samson's secretary. (Samson Supp. Decl. ¶ 12). Accordingly, the privileged communication was not disseminated beyond counsel and their clients.

### (iii) *April 8, 1999 Letter (Document 3)*

A letter dated April 8, 1999, transmits legal advice concerning the structuring of a transaction from Kim McMurray, an attorney at Nabarro Nathanson, to Mr. Cooper at UKI. In addition to attorneys and clients previously identified, a copy of the letter was sent to Ian Newman, who is an attorney at Nabarro Nathanson. (Samson Supp. Decl. ¶ 13). Therefore, no waiver of the privilege occurred.

### (iv) *August 16, 2001 E–Mail (Document 4)*

**\*5** The next document is an August 16, 2001 e-mail from Nicholas Aleksander at Gibson, Dunn to Mr. Cooper at UKI concerning legal advice about tax issues relating to Project Alliance. Copies were sent to three other attorneys at Gibson, Dunn: Mr. Samson, Jake Pidcock, and Nicholas Turner. (Samson Supp. Decl. ¶ 14). Only attorneys and client representatives were included in this exchange.

### (v) *August 7 and 8, 2001 E–Mails (Document 5)*

Ross v. ... Uecker; Not Reported in F.Supp.2d (2004)
Case 3:14-cv-00285    Document 100-1    Filed in TXSD on 08/27/15    Page 21 of 51
2004 WL 67221

The next document consists of an exchange of e-mails between Chris White at Tonex and Mr. Aleksander at Gibson, Dunn dealing with tax issues arising from Project Alliance. Copies were sent to a number of previously identified counsel and client representatives. No waiver of the privilege resulted.

**(vi)** *June 10 to July 7, 2001 E–Mail (Document 6)*

This document contains a series of e-mails concerning the tax implications of Project Alliance. The parties to this exchange are all identified above except for James Lasry, an attorney with the firm of Hassans, Tonex's counsel in Gibralter. (Samson Supp. Decl. ¶ 17).

**(vii)** *September 12—October 1, 2002 E–Mails (Document 7)*

The next document consists of a series of e-mails between Mr. Samson at Gibson, Dunn, Chris White of Tonex, and Paul Finn at UKI. The redacted portion relates to legal advice about the requirement for opening bank accounts needed for the loan transaction with GMAC. Mr. Finn was an employee of UKI who handled the opening of the accounts and was a necessary client representative for purposes of these communications. (Samson Supp. Decl. ¶ 18).

**(viii)** *March 19–20, 2003 E–Mails (Documents 8, 9, & 10)*

 **[4]**  These three documents contain e-mails among lawyers from Gibson, Dunn, Mr. Benady of Tonex, Mr. Cooper representing UKI, Jacob Schimmel, and Mark Morris. The exchanges concern certain aspects of the structuring of the GMAC transaction. With the exception of Mr. Morris, each of the participants was either an attorney or a client representative.

By this time, Mr. Morris had become a director of Investream, a real estate management services company. (Morris Supp. Decl., ¶ 2). That firm provided services to Tonex with respect to the GMAC transaction, "including sourcing and negotiating the financing and advising on the finance documents, as well as asset managing and supervising the day to day property managers at properties owned by Tonex...." (Morris Supp. Decl. ¶ 4). Investream thus acted as the functional equivalent of Tonex employees, and the expectation that it would maintain the confidentiality of attorney-client communications was reasonable. Moreover, its participation in attorney-client discussions concerning the GMAC transaction was necessary in light of its role in structuring the deal.

**(ix)** *February 19, 2003 E–Mails (Document 11)*

The redacted portion of this document consists of e-mails between Mr. Samson of Gibson, Dunn and Mr. Morris of Investream concerning the legal implications of a particular aspect of the GMAC transaction. The e-mails were also disseminated to representatives of Tonex and UKI and to two other employees of Investream, Maurice Golker and Gavin Riordan. (Morris Supp. Decl. ¶ 7). All of these persons are within the constellation of appropriate participants in the attorney-client communications.

**(x)** *January 29, 2003 E–Mails (Document 12)*

 **\*6**  Finally, the redacted section of this document is again an e-mail exchange between Mr. Samson and Mr. Morris dealing with legal advice with respect to the GMAC transaction The other addressees are representatives of UKI and Investream. Once more, this document was not disseminated in a manner that would waive the attorney-client privilege.

In sum, with respect to each of the documents at issue, the persons who were privy to attorney-client communications were representatives of the clients Tonex and UKI and were necessary to provide the information upon which counsel could base their advice. There was therefore no waiver of the privilege.

**3.** *Crime/Fraud Exception*

 **[5]**  The plaintiffs also argue that the documents at issue are not privileged because they reflect communications made in furtherance of the crime of tax fraud. It is well established that a client's expressed intent to commit a crime or perpetrate a fraud is not a privileged communication. *See* *Nix v. Whiteside,* *475 U.S. 157, 174, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986);* *People v. DePallo,* *96 N.Y.2d 437, 442, 729 N.Y.S.2d 649, 652, 754 N.E.2d 751 (2001);* *Surgical Design Corp. v. Correa,* *284 A.D.2d 528, 529, 727 N.Y.S.2d 462, 462 (2d Dep't 2001).* There is no evidence, however, that the communications at issue here were of that nature.

While the burden of establishing a privilege is generally on the party seeking its protection, the responsibility for demonstrating that the crime/fraud exception is applicable is on the party seeking to invoke it. *See* *Bria v. United States,* *No. 00 CV 1156, 2002 WL 663862, at \*4 (D.Conn. March 26, 2002).*

A party wishing to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime. This is a two-step process. First, the proposed factual basis must strike "a prudent person" as constituting "a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof." *In re John Doe, Inc.,* 13 F.3d 633, 637 (2d Cir.1994) (quoting *In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1039 (2d Cir.1984)). Once there is a showing of a factual basis, the decision whether to engage in an *incamera* review of the evidence lies in the discretion of the district court. *United States v. Zolin,* 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). Second, if and when there has been an *incamera* review, the district court exercises its discretion again to determine whether the facts are such that the exception applies.

*United States v. Jacobs,* 117 F.3d 82, 87 (2d Cir.1997). Here, the plaintiffs have satisfied neither prong of their burden. They speculate that because the defendants have created business entities exclusively for the purpose of engaging in specific transactions, they must have done so to avoid paying taxes. But it is entirely appropriate for a party to seek to minimize its taxes and for counsel to provide advice on how to do so. *See Knetsch v. United States,* 364 U.S. 361, 365, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). The plaintiffs here have not presented facts from which I could find probable cause to believe that the defendants had crossed the line that separates tax avoidance from tax fraud. *See Bria,* 2002 WL 663862, at *4 (speculation concerning tax fraud insufficient to establish crime/fraud exception). Second, even if the plaintiffs had met this threshold, I have reviewed the disputed documents *incamera* and find that their content does not support the plaintiffs' speculation. The crime/fraud exception therefore does not apply. [1]

[1]   The plaintiffs seek an award of attorneys' fees pursuant to Rule 37(a)(4) and 28 U.S.C. § 1927 on the theory that the defendants' assertion of privilege was unreasonable, as demonstrated by the fact that they removed the vast majority of documents from their privilege log once the plaintiffs' motion was filed. Although I do not countenance the tactic of resisting discovery until an adversary is forced to make a motion, in this case the plaintiffs have not been prejudiced. They would have been required to make the same arguments regardless

of the number of documents withheld. The plaintiffs' application is therefore denied.

**B.** *Relevance*

**\*7**   The defendants have objected to many of the categories of items sought in Plaintiffs' Second Request for the Production of Documents and Things ("Second Request"). The defendants contend that the plaintiffs' discovery should be limited to information relating to "plaintiffs' claims that they had oral agreements with the defendants to receive brokerage commissions on the underlying transactions and that they were the procuring cause of those transactions."(Defendants' Supplemental Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery, at 12). By contrast, the plaintiffs argue that they are entitled to take discovery with respect to issues which, although not the ultimate issue which the defendants have identified, are nonetheless central to the litigation. For example, the defendants apparently dispute whether Jacob Schimmel or UKI had authority to act on behalf of Tonex in entering into any agreements with the plaintiffs. Therefore, according to the plaintiffs, they should be able to explore the question of authority, including whether Mr. Schimmel and UKI are alter egos of Tonex. (Plaintiffs' Memorandum of Law in Further Support of Their Motion to Compel Discovery ("Pl. Reply Memo."), at 9–10). Similarly, the plaintiffs contend that they are entitled to take discovery regarding the financial arrangements between Investream and the defendants because the services provided by Mr. Morris of Investream paralleled those provided by the plaintiffs. (Pl. Reply Memo. at 9–10). Finally, the plaintiffs seek information about the ownership and control of the entities through which the transactions at issue were conducted. (Pl. Reply Memo, at 10).

[6]   Although the plaintiffs' requests are in several instances overbroad, they generally seek relevant information. Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that parties may obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defenses of any party.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."Thus, relevance for purposes of discovery is an extremely broad concept. *See Melendez v. Greiner,* No. 01 Civ. 7888, 2003 WL 22434101, at *1 (S.D.N.Y. Oct.23, 2003); *Zanowic v.. Reno,* No. 97 Civ. 5292, 2000 WL 1376251, at *2 (S.D.N.Y. Sept.25, 2000). It is certainly not limited, as the defendants

Case 3:14-cv-00285 Document 100-1 Filed in TXSD on 08/27/15 Page 23 of 51

suggest, to information directly supporting or contradicting the ultimate question in a case, narrowly formulated.

 [7]   In the instant action, the plaintiffs must be allowed to take discovery regarding the relationships among the various defendants. They cannot be denied the opportunity to develop evidence to rebut the defense that commitments made by Jacob Schimmel or UKI cannot be attributed to Tonex. Moreover, the Complaint itself contains allegations suggestive of an alter ego argument. (Compl.¶¶ 11, 12). Accordingly, the defendants shall provide all documents responsive to items no. 3 and 5 in the Second Request. Items no. 4, 14, and 15 also seek information related to the relationships among the defendants, but they cast far too wide a net, demanding all communications concerning the management of the trust that owns Tonex, all minutes of UKI shareholder meetings, and all UKI board minutes. These overbroad and burdensome requests need not be responded to.

 **8**   Item no. 6 seeks information about the payment of fees to Mr. Morris by Tonex, UKI, or any related entity in connection with the GMAC transaction. This targeted request is appropriate since it is designated to provide evidence about whether Mr. Morris had a financial arrangement with the defendants similar to that which the plaintiffs contend they were promised. The defendants shall therefore produce the requested documents.

According to the plaintiffs, the defendants frequently engaged in transactions utilizing business entities specially created for the occasion. To the extent this is true, the structure of these entities could well provide relevant information about the relationships among the defendants similar to that

sought in items no. 3 and 5. Accordingly, the defendants shall produce the documents responsive to items no. 8, 9, 10, 11, 12, 13, 22, and 23. However, neither the decision to include certain of the properties belonging to these entities in the Westbrook transaction nor the value allocated to those properties is relevant to any claim or defense in this action, and the defendants need not respond to items 19, 20, or 24.

 [8]   Finally, in item no. 7, the plaintiffs seek documents relating to commissions paid by the defendants to the plaintiffs. Such information is relevant because, to the extent such payments were based on authorizations similar to those communicated in connection with the contested transactions, and to the extent the services provided were similar, it would provide support for the plaintiffs' claims. Accordingly, the defendants shall produce all documents responsive to this request.

### Conclusion

For the reasons set forth above, the plaintiffs' motion to compel discovery is denied insofar as it is directed to the twelve documents that the defendants have withheld on the basis of the attorney-client privilege. The motion is granted to the extent that I have overruled certain of the defendants' relevance objections to Plaintiffs' Second Request for the Production of Documents and Things.

    SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2004 WL 67221

---

End of Document
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 4258246
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas,
Dallas Division.

SPIEGELBERG MANUFACTURING, INC.
d/b/a Pro-Weld International, Plaintiff,

v.

Kelly HANCOCK d/b/a K-R-
H Services, et al., Defendants.

No. 3-07-CV-1314-G.  |  Dec. 3, 2007.

**Attorneys and Law Firms**

Alan J. Marcuis, Brian D. Johnston, Hunton & Williams, Dallas, TX, D. Peter Valiotis, Clark Hill PLC, Detroit, MI, Mahesh K. Nayak, Clark Hill PLC, Birmingham, MI, for Plaintiff.

Walter S. Cowger, Law Office of Walter S. Cowger, Dallas, TX, for Defendants.

### MEMORANDUM ORDER

JEFF KAPLAN, United States Magistrate Judge.

**\*1** Plaintiff Spiegelberg Manufacturing, Inc. d/b/a Pro-Weld International has filed a motion to compel discovery in this diversity action brought against two former employees, Defendants Kelly Hancock and Brian Barrow, alleging claims under Texas law for theft, conversion, breach of fiduciary duty, and breach of the duty of loyalty. Defendants counterclaim for unpaid commissions and wages. At issue in this discovery dispute is whether defendants should be required to answer interrogatories and produce documents related to: (1) their new employer, Tru-Weld; (2) K-R-H Services, a side business operated by Hancock while he was employed by plaintiff; (3) communications generated by defendants after June 8, 2007, the date they resigned their employment with plaintiff; and (4) defendants' counterclaims. The parties have briefed their respective positions in a Joint Status Report filed on November 29, 2007, and the motion is ripe for determination. [1]

[1] Defendants request an opportunity to file a separate response to the arguments made by plaintiff in its motion

to compel because they "have not yet seen [the motion] nor some of the exhibits to it[.]" (Jt. Stat. Rep., 11/29/07 at 2). The request is denied. The Standing Order on Discovery Motions issued on August 2, 2007, provides that "[n]o discovery motion shall be filed unless the attorneys first confer by telephone or meet face-to-face in an attempt to resolve all matters in dispute." *See* Standing Order, 8/7/07 at 2, ¶ 2. The order goes on to state:

> The purpose of a joint status report is to enable the court to determine the respective positions of each party regarding the subject matter of a discovery dispute. To this end, the parties should present their arguments and authorities in the body of the report. Supporting evidence and affidavits may be submitted in a separate appendix. If further briefing is desired before any unresolved matters are set for a hearing, the joint status report must indicate why the party requesting further briefing could not fully present its arguments and authorities in the report. The court, in its discretion, may allow further briefing upon request by any party.

*See id.* at 2-3, ¶ 3. Although defendants did not receive a copy of plaintiff's motion to compel before they signed the joint status report, the attorneys presumably discussed their respective positions and disclosed their legal authorities during a one-hour telephone conference held on November 8, 2007-21 days before the joint status report was filed. Significantly, defendants do not suggest that plaintiff was not forthcoming with its arguments and authorities at this conference. Without such a showing, the court will not allow further briefing. *See Brody v. Zix Corp.,* No. 3-04-CV-1931-K, 2007 WL 1544638 at \*1 n. 1 (N.D.Tex. May 25, 2007) (Kaplan, J.) (denying request for further briefing where attorneys were given an opportunity to fully discuss the basis of a discovery motion before filing their joint status report).

Fed.R.Civ.P. 26(b) allows a party to obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party [.]" The information sought need not be admissible at trial "if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."Fed.R.Civ.P. 26(b)(1). As the party seeking discovery, plaintiff must establish this threshold burden. *See E.E.O.C. v. Renaissance III Organization,* No. 3-05-CV-1063-B, 2006 WL 832504 at \*1 (N.D.Tex. Mar.30, 2006) (Kaplan, J.), *citing Vardon Golf Co., Inc. v. BBMG Golf Ltd.,* 156 F.R.D. 641, 650 (N.D.Ill.1994) ("To place the burden of proving that the evidence sought is not reasonably calculated to lead to the discovery of admissible evidence on the opponent of discovery is to ask that party to prove a negative. This is an unfair burden, as it would require a party

to refute all possible alternative uses of the evidence, possibly including some never imagined by the proponent."). Once plaintiff establishes that its interrogatories and document requests are within the scope of permissible discovery, the burden shifts to defendants to show why discovery should not be permitted. *See Corrigan v. Methodist Hospital,* 158 F.R.D. 54, 56 (E.D.Pa.1994); *Amcast Industrial Corp. v. Detrex Corp.,* 138 F.R.D. 115, 118 (N.D.Ind.1991).*But see Merrill v. Waffle House, Inc.,* 227 F.R.D. 475, 477 (N.D.Tex.2005) (Lynn, J.), *quoting McLeod, Alexander, Powel and Apffel, P.C. v. Quarles,* 894 F.2d 1482, 1485 (5th Cir.1990) (holding that party opposing discovery must "show specifically how ... each [request] is not relevant or how each [request] is overly broad, burdensome or oppressive.").

In two interrogatories and three requests for production, plaintiff seeks information and documents regarding defendants' new employer, Tru-Weld:

**Interrogatory No. 8:**

Identify any current customers of Tru-Weld that were customers of Plaintiff during your tenure of employment with Plaintiff, and the date(s) or timeframe that any such customers became customers of Tru-Weld.

**Interrogatory No. 11:**

**\*2** Identify and describe in detail the manner in which you are compensated by Tru-Weld. Your response should identify and describe in detail:

(a) The frequency in which you are paid by Tru-Weld;

(b) Whether you are paid on a salary basis, hourly basis, and/or receive sales commissions and bonuses; and the amount, rates, and percentages at which you are paid; and

(c) Whether any of the sales commissions or other compensation that you have received from Tru-Weld was for business from customers that were customers of Plaintiff during your tenure of employment with Plaintiff.

**Request for Production No. 9:**

Produce all documents that identify or evidence any current customers of Tru-Weld that were customers of Plaintiff during your tenure of employment with Plaintiff including, but not limited to, any customer[ ] lists, invoices,

order [ ] forms, or other documentation concerning such information.

**Request for Production No. 12:**

Produce all documents that concern or relate to the manner in which you are, or have been, compensated by Tru-Weld including, but not limited to, any pay-stubs, commission statements, bank statements, taxation forms, or other documents evidencing such information.

**Request for Production No. 13:**

Produce all documents that concern or relate to sales commissions or other compensation that you received from Tru-Weld relating to business that Tru-Weld received from customers that were customers of Plaintiff during your tenure of employment with Plaintiff.
These discovery requests, which are narrowly tailored to determine whether defendants diverted plaintiff's customers to Tru-Weld, are clearly relevant to plaintiff's claims for theft, conversion, breach of fiduciary duty, and breach of the duty of loyalty. The same is true for discovery related to K-R-H Services, a side business operated by Hancock:

**Interrogatory No. 12:**

Identify and describe in detail all other businesses or enterprises that you operated, or were involved in, during the tenure of your employment with Plaintiff including, but not limited to, any business entity operating under the name "K-R-H Services." Your response should identify and describe in detail:

(a) Your role or position in any such business or enterprise;

(b) The nature of the goods and/or services provided by any such business or enterprise;

(c) Whether any goods and/or services provided by any such business or enterprise are or were also provided by Plaintiff; and

(d) Whether any customers of any such business or enterprise were also customers of Plaintiff.

**Interrogatory No. 16:**

Identify all suppliers to and customers of K-R-H Services.

**Request for Production No. 15:**

Produce all documents that concern or relate to any other businesses or enterprises that you operated, or were otherwise involved in, during the tenure of your employment with Plaintiff including, but not limited to, any [and] all documents that concern or relate to an entity operating under the name "K-R-H Services."

***Request for Production No. 21:***

 **\*3** Produce all documents which market or advertise any goods and services supplied by K-R-H Services.

***Request for Production No. 24:***

Produce all invoices received by K-R-H Services in the last 5 years.

***Request for Production No. 25:***

Produce all statements/invoices issued by K-R-H Services in the last 5 years.

Although defendants object that some of these discovery requests are overly broad and unduly burdensome, they cite no legal authority or provide any evidence to support such objections. The court determines, however, that any discovery related to K-R-H Services should be limited to information and documents predating defendants' resignation on June 8, 2007.

The court reaches a different conclusion with respect to the discovery of documents and communications generated by defendants after June 8, 2007:

***Request for Production No. 8:***

Produce all documents that concern or relate to any assistance that you and/or Defendant Barron provided to Tru-Weld in opening, stocking and/or making operational any of its warehouses.

***Request for Production No. 10:***

Produce all documents that concern or relate to any efforts in which you and/or Defendant Barron engaged to solicit, persuade, or otherwise convince any customers of Plaintiff to become customers of Tru-Weld.

***Request for Production No. 11:***

Produce all documents that concern or relate to any oral or written communications that you and/or Defendant Barron had with Plaintiff's customers, during which you and/or

Defendant Barron solicited them, or attempted to persuade them, to become customers of Tru-Weld.

***Request for Production No. 19:***

Produce all documents that relate to any dealings that you had with Plaintiff's customers on behalf of Tru-Weld.

Defendants have agreed to produce all communications between them generated while they were employed by plaintiff, as well as communications generated after June 8, 2007 that refer to events occurring before their resignation. (*See* Jt. Stat. Rep., 11/29/07 at 13). Because defendants did not have a non-competition agreement with plaintiff, the court is not convinced that communications between defendants and plaintiff's customers after June 8, 2007 are reasonably calculated to lead to the discovery of admissible evidence.

Plaintiff also seeks certain financial documents that relate to defendants' counterclaims for unpaid commissions and wages. Two of the document requests are plainly relevant to defendants' counterclaims and must be produced:

***Request for Production No. 22:***

Produce copies of all documents you received from Plaintiff regarding commissions, or commission rates or payments.

***Request for Production No. 26:***

Produce copies of all checks, and check stubs, or any other documents reflecting compensation Plaintiff paid you from January 1, 2007 to present.

However, discovery of defendants' 2006 and 2007 federal and state income tax returns and supporting documents, (*see* RFP No. 18), and bank statements from January 1, 2007 to the present, (*see* RFP No. 27), is overly broad. The court will not allow such discovery unless it is limited to financial information directly related to wages and commissions paid to defendants by plaintiff.

 **\*4** For these reasons, plaintiff's motion to compel discovery [Doc. # 27] is granted in part and denied in part. The motion is granted with respect to Interrogatory Nos. 8 & 11 and Request for Production Nos. 9, 12, 13, 22 & 26. The motion is also granted with respect to Interrogatory Nos. 12 & 16 and Request for Production Nos. 15, 21, 24 & 25, but only as to information and documents predating defendants' resignation on June 8, 2007. Defendants shall serve answers to these interrogatories and produce responsive documents to plaintiff by ***December 17, 2007.*** In addition, defendants shall produce

all communications between them generated while they were employed by plaintiff, as well as communications generated after June 8, 2007 that refer to events occurring before their resignation. In all other respects, plaintiff's motion to compel discovery, including its request for costs and attorney's fees, is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 4258246

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

2014 WL 3385213
Only the Westlaw citation is currently available.
United States District Court,
M.D. North Carolina.

Whitney STEPHENSON, Plaintiff,

v.

PFIZER INC., Defendant.

No. 1:13CV147.    |    Signed July 9, 2014.

**Attorneys and Law Firms**

Robert M. Elliot, Elliot Morgan Parsonage, P.A., Winston–Salem, NC, for Plaintiff.

Paul Holscher, Jackson Lewis LLP, Cary, NC, Stephanie E. Lewis, Andreas N. Satterfield, Jr., Jackson Lewis LLP, Greenville, SC, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

L. PATRICK AULD, United States Magistrate Judge.

**\*1** This case comes before the Court on Defendant's Memorandum in Support of Defendant's Position that it Should Not Be Required to Pay Plaintiff's Fees or Expenses (Docket Entry 34) concerning Plaintiff's request for expense-shifting in her Motion to Compel (Docket Entry 21). For the reasons that follow, the Court will order Defendant to pay Plaintiff $2,919.70 in reasonable expenses, including attorney's fees, incurred in making her Motion to Compel.

### *I. BACKGROUND*

Plaintiff's Complaint asserts that Defendant, her former employer, failed to reasonably accommodate her disability as required by the Americans with Disabilities Act (ADA). (Docket Entry 1 at 10–12.) Defendant's Answer asserted, inter alia, that "[t]he accommodations requested by Plaintiff were not reasonable" (Docket Entry 6 at 7) and that "Defendant was not required to make accommodations because to do so would impose an undue hardship"(*id.* at 8). Plaintiff filed a Motion to Compel as to several document requests, in which she sought expense-shifting. (Docket Entry 21 at 4.) Defendant responded in opposition (Docket Entry 26), Plaintiff replied (Docket Entry 28), and the Court set

the matter for a hearing on April 4, 2014 (Docket Entry dated Apr. 2, 2014). At the hearing, the Parties reached an agreement as to certain discovery requests (i.e., Plaintiff's document requests numbered 17, 18, 19, 43, 53, 58, 59, and 62) and the Court then considered those requests which remained in dispute. (*See* Docket Entry dated Apr. 4, 2014.) After considering the Parties' arguments, the Court ordered Defendant to respond to all of the remaining, disputed requests (i.e., Plaintiff's document requests numbered 44 through 52), but also narrowed the scope of those requests. (*See id.;*Text Order dated Apr. 4, 2014.)

The Court further directed the Parties to work together to resolve minor issues as to the scope of certain of the requests, as well as the issue of expense-shifting, and to inform the Court as to the outcome of those negotiations. (*See* Docket Entry dated Apr. 4, 2014; Text Order dated Apr. 4, 2014.) Subsequently, the Parties informed the Court that they had resolved all outstanding issues as to the scope of Plaintiff's discovery requests. (Docket Entry 31.) The Parties then filed a Notice outlining their disagreement as to the appropriateness of expense-shifting. (Docket Entry 32.)

In response to that Notice, the Court concluded that, because it only granted Plaintiff's Motion to Compel in part, it would consider whether to order partial expense-shifting in this case. (Docket Entry 33 at 4 (quoting Fed.R.Civ.P. 37(a)(5)(C) for the proposition that, " 'i]f the motion is granted in part and denied in part, the court ... may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion' ').) Further, the Court held that, contrary to Defendant's position, Federal Rule of Civil Procedure 37(a)(5)(C) does not preclude an award of attorney's fees as part of a party's reasonable expenses. (*Id.* at 6–7.)The Court then directed the Parties to again work to resolve expense-shifting issues and, absent any agreement, to further brief the appropriateness and amount of expense-shifting in light of the Court's Order. (*Id.* at 7.)

**\*2** The Parties did not reach any further agreement (*see* Docket Entry 34 at 1) and instead Plaintiff served Defendant with an affidavit and statement of expenses (*see* Docket Entry 34–1). Accordingly, Defendant filed the instant Memorandum in which it asserts that Plaintiff has no entitlement to expense-shifting because Plaintiff failed to confer in good faith before moving to compel, because Defendant had substantial justification for objecting to Plaintiff's discovery requests, and because Defendant substantially prevailed as to the Motion to Compel. (Docket

Entry 34 at 6–9.) [1] In addition, Defendant contests some specific items included in Plaintiff's statement of expenses. (*Id.* at 9–10.)Plaintiff responded in opposition (Docket Entry 42) and Defendant replied (Docket Entry 43).

[1]    Defendant also reiterated its position that Federal Rule of Civil Procedure 37(a)(5)(C) precludes any award of attorney's fees (as part of reasonable expenses) when a court grants in part and denies in part a motion to compel. (*See* Docket Entry 34 at 5–6.) Because the Court has already ruled against Defendant's position with respect to that interpretation of Rule 37(a)(5)(C) (*see* Docket Entry 33 at 6–7), it will not address that argument further.

## II. DISCUSSION

### A. Appropriateness of Expense–Shifting

Because the Court granted Plaintiff's Motion to Compel "in part and denied [it] in part, the [C]ourt may ... after giving an opportunity to be heard, apportion the reasonable expenses for the [M]otion,"Fed.R.Civ.P. 37(a)(5)(C). However, the Court should not award expenses to the moving party if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.

Fed.R.Civ.P. 37(a)(5)(A); *see also Charter Practices Int'l, LLC v. Robb*, No. 3:12CV1768 (RNC), 2014 WL 273855, at *5 (D.Conn. Jan.23, 2014) (unpublished) ("Rule 37(a)(5)(C) effectively incorporates the substantive standards of Rule 37(a)(5)(A)[, in] that expenses of a discovery motion may be imposed upon a party ordered to produce discovery where that party's conduct necessitated the motion unless the nondisclosure or objection was substantially justified or other circumstances make an award of expenses unjust."(internal quotation marks omitted)); *Switch Commn'cns Grp. LLC v. Ballard*, No. 2:11CV285 JCM (GWF), 2011 WL 5041231, at *1 (D.Nev. Oct.24, 2011) (unpublished) ("The same factors guide a court's decision under both subsection 37(a)(5)(A) and 37(a)(5)(C).").

As an initial matter, Defendant contends that Plaintiff moved to compel before conferring in good faith to resolve the issues without court intervention, as required by Federal Rule

of Civil Procedure 37(a)(1) and Local Rule 37.1(a). (*See* Docket Entry 34 at 8–9.) In that regard, Defendant asserts that Plaintiff, after sending a letter to Defendant outlining Plaintiff's concerns (on February 3, 2014), actually *drafted* the Motion to Compel on February 6, 2014, before receiving Defendant's response on February 7, 2014, upon which date Plaintiff filed said Motion. (*See id.* at 9.) According to Defendant, this sequence of events shows that Plaintiff improperly "viewed Rule 37(a)(1)'s mandate to confer in good faith with [Defendant] as a mere formality." (*Id.*)

**\*3** Given that discovery in this case closed on February 7, 2014 (*see* Text Order dated Dec. 19, 2013), and that such date also reflected the default deadline for moving to compel, *see Lane v. Lucent Techs., Inc.*, No. 1:04CV789, 2007 WL 2079879, at *3 (M.D.N.C. July 17, 2007) (Osteen, Sr., J.) (unpublished) ("Generally, a party must file a motion to compel before the close of discovery in order for that motion to be deemed timely."), the Court finds reasonable Plaintiff's advance preparation before and prompt action upon receiving Defendant's response (which conveyed Defendant's blanket refusal to respond to the requests which remained in dispute at the hearing (*see* Docket Entry 26–12 at 2– 4)). The Court thus concludes that, under the facts of this case, Plaintiff adequately consulted with Defendant, *see, e.g., Kidwiler v. Progressive Paloverde Ins. Co.*, 192 F.R.D. 193, 197–98 (N.D.W.Va.2000) (finding submission of letter detailing disputed issues sufficient to meet Rule 37's consultation requirement), particularly given that, even after further negotiations on the hearing date, Defendant maintained one or more positions that (as explained both in court on the record and in the discussion which follows) the Court ultimately found wholly meritless (indicating that additional consultation efforts by Plaintiff prior to moving to compel would not have resolved the dispute), *see, e.g., Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 245 n. 28 (M.D.N.C.2010) (rejecting notion that consultation requirement mandated redundant and likely futile measures).

Next, Defendant contends that Plaintiff has no entitlement to expense-shifting because Defendant had substantial justification for opposing Plaintiff's Motion to Compel. (Docket Entry 34 at 8.) "A legal position is 'substantially justified' if there is a 'genuine dispute' as to proper resolution or if 'a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.' " *Decision Insights, Inc. v. Sentia Grp., Inc.*, 311 F. App'x 586, 599 (4th Cir.2009) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565–66 n. 2, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). Accordingly,

Defendant asserts that its "objections were based on and supported by numerous cases throughout the country holding that the type of financial data sought by Plaintiff is not discoverable in cases similar to the instant case." (Docket Entry 34 at 8.)

In opposing Plaintiff's Motion to Compel (as to Plaintiff's document requests numbered 43 through 52 and 62, specifically), Defendant largely argued that its confidential financial information bore no relevance to this case, because "cost was not the basis for the denial of the requested accommodation."(Docket Entry 26 at 16.) In support of its position, Defendant cited to several cases in which courts determined that the fact that a complaint seeks punitive damages does not alone entitle a plaintiff to discovery concerning a defendant's confidential financial information. (*Id.* at 15–16 (citing cases).) Only one of those cases actually involves arguments related to the reasonable accommodation inquiry and the related employer defense of undue hardship (in addition to the punitive damages issue); moreover, in that case, the plaintiff raised such an argument for the first time at the hearing and it did not appear to significantly affect the court's reasoning. *See EEOC v. D & H Co. Dodge Bros. Giant Oil of Ark., Inc.,* No. 6:10CV0672, 2011 U.S. Dist. LEXIS 128996, at *4–6 (W.D.Ark. Nov. 4, 2011) (unpublished).

**\*4** In contrast, persuasive authority confirms the direct relevance of a defendant's financial status to the determination of whether an accommodation's cost renders it unreasonable or an undue hardship on the employer (issues raised by Defendant in this case (*see* Docket Entry 6 at 7–8)).*See, e.g., Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 543 (7th Cir.1995) ("So it seems that costs enter at two points in the analysis of claims to an accommodation to a disability. The employee must show that the accommodation is reasonable in the sense both of efficacious and of proportional to costs. Even if this prima facie showing is made, the employer has an opportunity to prove that upon more careful consideration the costs are excessive in relation either to the benefits of the accommodation or to the employer's financial survival or health."). Furthermore, the ADA specifically defines undue hardship as "an action requiring significant difficulty or expense, when considered in light of the factors set forth .... [including] the nature and cost of the accommodation needed under this chapter ... [and] the overall financial resources of the covered entity."42 U.S.C. § 12111(10). In light of such authority and the defenses asserted in Defendant's Answer, Defendant's argument for the irrelevancy of discovery concerning its finances to the

reasonable accommodation inquiry lacks "a reasonable basis in law and fact,"*Decision Insights,* 311 F. App'x at 599. [2]

[2]  Defendant's contention at the hearing that concerns over liability related to the requested accommodation do not constitute concerns about cost related to the requested accommodation similarly defies reasoned analysis, because "liability" simply represents a mechanism for allocating costs, *see, e.g., Pruitt v. Allied Chem. Corp.,* 523 F.Supp. 975, 978 (E.D.Va.1981) (recognizing consensus "that a principal purpose of tort law is to maximize social utility: where the costs of accidents exceeds the costs of preventing them, the law will impose liability").

Under these circumstances, and given the absence of argument by Defendant that other considerations would render expense-shifting unjust (*see* Docket Entry 34 at 7–9), the Court will exercise its discretion to order Defendant to pay a portion of Plaintiff's reasonable expenses pursuant to Federal Rule of Civil Procedure 37(a)(5)(C).

**B. Amount of Expense–Shifting**

Plaintiff's statement of expenses indicates fees totaling $8,460 (representing 24.2 hours of attorney time billed at $350 per hour) and costs totaling $39.20. (Docket Entry 34–1 at 5.) [3] In disputing the amount of expense-shifting, Defendant contends (1) that the Parties resolved several of the disputed discovery requests without the Court's intervention, (2) that, with respect to Plaintiff's discovery requests as to which the Court granted relief, the Court also ruled in Defendant's favor by narrowing those requests, and (3) that several items billed by Plaintiff do not properly reflect reasonable expenses incurred in *making* her Motion to Compel. (Docket Entry 34 at 6–9.) Defendant does not contest the reasonableness of the hourly rate claimed by Plaintiff's counsel or the number of hours spent by counsel for any particular task. (*Id.* at 1–10.)

[3]  Based on the rate of $350 per hour claimed by Plaintiff's counsel, 24.2 hours of attorney work actually would amount to $8,470 in fees rather than $8,460.

As to the first of the foregoing matters, Defendant asserts that the Parties came to an agreement as to 41% of the discovery requests originally identified in the Motion to Compel and, thus, the Court should reduce Plaintiff's expenses accordingly. (Docket Entry 34 at 2–3, 10.) The record reflects that the Parties, in fact, reached a consensus regarding 47% of the initially disputed requests (i.e., eight of

seventeen) prior to the hearing. (*See id.*)[4] Plaintiff does not deny that the Parties resolved those items without the Court's intervention.[5] Given this negotiated production, the Court will exercise its discretion under Rule 37(a)(5)(C) to order the Parties to bear their own expenses for motion-practice related to those requests. Accordingly, after identifying what dollar amount qualifies as reasonable expenses incurred by Plaintiff in moving to compel, the Court will impose a reduction of 47%.

[4]     Defendant's instant Memorandum omits the fact that, prior to the hearing, the Parties resolved any dispute about Plaintiff's document request numbered 58. (*See* Docket Entry 34 at 2–3.)

[5]     Plaintiff notes that "Defendant's numerical tally, claiming 41% victory is misleading to say the least."(Docket Entry 42 at 5 n. 5.) However, the Court need not attribute "victory" to Defendant as to the 47% of requests in question to deny expense-shifting for the related portion of Plaintiff's Motion to Compel. Moreover, Plaintiff provides no explanation as to why the Court should not exclude from expense-shifting the 47% of disputed requests originally in her Motion to Compel that she and Defendant resolved on undisclosed terms. (*See id.* at 1–7.)

**\*5** Defendant next asserts that it "[p]revailed [w]ith [r]espect to the [m]ajority of the [i]ssues [r]aised" in connection with Plaintiff's requests for Defendant's financial information because the Court, in granting relief as to those requests, also narrowed their scope. (Docket Entry 34 at 6–7.) Defendant's success in obtaining some narrowing of the requests at issue occurred at the margins; Plaintiff, by contrast, substantially prevailed as to the *substance* of the material dispute regarding those requests. Defendant cites to several cases, including two decisions of this Court, in which a movant's partial success led to an order requiring both sides to bear their own costs. (Docket Entry 34 at 6–7 (citing *Moore v. DAN Holdings, Inc.,* 2013 WL 1833557, at \*17 n. 11 (M.D.N.C. Apr.30, 2013) (unpublished), and *Morris v. Lowe's Home Ctrs., Inc.,* 1:10CV388, 2012 WL 5347826, at \*13 (M.D.N.C. Oct.26, 2012) (unpublished)).) However, those cases involved circumstances in which the conduct of both Parties contributed (relatively) equally to the discovery litigation and in which both Parties obtained substantial relief. *Moore,* 2013 WL 1833557, at \*17 n. 11; *Morris,* 2012 WL 5347826, at \*13.

In the instant case, unlike those cited by Defendant, the Court found no reasonable basis for Defendant's position

regarding the purported irrelevance of its finances and ruled that Defendant had to produce such discovery. Moreover, at the hearing, Plaintiff expressed a willingness to narrow the scope of the disputed requests while Defendant adhered to its position that any information about its finances bore no relevance to the issue of reasonable accommodation —a position for which (as discussed above) Defendant lacked substantial justification. Finally, the Court's direction that Plaintiff narrow the scope of the language in the requests to avoid overbreadth reflected a comparatively minor adjustment. Such circumstances warrant some expense-shifting in Plaintiff's favor. *See, e.g., Dauska v. Green Bay Packaging Inc.,* 291 F.R.D. 251, 263 (E.D.Wis.2013) (granting motion to compel in part and awarding partial expenses to substantially prevailing plaintiff under Rule 37(a)(5)(C), while characterizing defendant's arguments in opposition as "baseless" and plaintiff's requests as "overly broad"). Nonetheless, because the Court agreed with Defendant as to the overbreadth of the requests at issue, the Court will reduce the portion of Plaintiff's reasonable expenses attributable to requests numbered 43 through 52 by 25% to account for Defendant's limited success.

Finally, Defendant asserts that several items which appear on Plaintiff's statement do not constitute expenses " 'incurred in making the motion.' " (Docket Entry 34 at 9–10 (quoting Fed.R.Civ.P. 37(a)(5)(A)).) Specifically, Defendant notes that Plaintiff has included in her statement work performed prior to drafting the Motion to Compel as well as work performed after the Court granted said Motion in part. (*See id.* at 10.)The Court agrees and accordingly will deduct 1.5 hours spent reviewing discovery and drafting a letter regarding deficiencies, .6 hours spent preparing a notice to the Court following the hearing, and 1.4 hours spent preparing a notice to the Court regarding fee shifting.[6] As a result, 20.7 hours represents the reasonable amount of time spent by Plaintiff making her Motion to Compel.

[6]     However, the Court will not exclude 1.7 hours spent by Plaintiff's counsel preparing for the hearing and preparing a proposal to resolve the discovery dispute, as requested by Defendant, because the Court construes those activities as part of making the Motion to Compel.

**\*6** As discussed above, the Court will reduce that amount by 47% (to 10.97 hours) to account for the discovery requests resolved by the Parties prior to the hearing. From that remaining sum, the Court will make an additional reduction of 25% (to 8.23 hours) because Defendant prevailed as to the overbreadth of the remaining disputed requests, resulting

in reasonable attorney's fees equaling $2,880.50 (i.e., 8.23 hours at $350 per hour). As a final matter, the Court will order Defendant to compensate Plaintiff for travel expenses in connection with attending the hearing in the amount of $39.20 (*see* Docket Entry 34–1 at 5). [7] Thus, Defendant must pay Plaintiff reasonable expenses, including attorney's fees, totaling $2,919.70.

[7]  Defendant neither challenges Plaintiff's ability to recover travel costs (as opposed to attorney's fees) under Federal Rule of Civil Procedure 37(a)(5)(C) nor contests the reasonableness of the costs incurred in that regard. (*See* Docket Entry 34; Docket Entry 43.)?

### III. CONCLUSION

Plaintiff has demonstrated an entitlement to compensation for a portion of her reasonable expenses, including attorney's fees, incurred in making her Motion to Compel.

**IT IS THEREFORE ORDERED** that Defendant pay Plaintiff $2,919.70 in reasonable expenses, including attorney's fees, incurred in making Plaintiff's Motion to Compel (Docket Entry 21).

**All Citations**

Slip Copy, 2014 WL 3385213

---

End of Document

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2015 Thomson Reuters. No claim to original U.S. Government Works.                                                                 5

2012 WL 6858239
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Corpus Christi Division.

WHITE ROSEBAY SHIPPING S.A.
v.
HNA GROUP CO., LTD., et al.

C.A. No. C–12–096. | Dec. 5, 2012.

**Attorneys and Law Firms**

Michael J. Frevola, Warren Gluck, Holland Knight LLP, New York, NY, William Sean O'Neil, Attorney at Law, Houston, TX, for White Rosebay Shipping S.A.

Derek A. Walker, Chaffe McCall LLP, New Orleans, LA, John "Jack" C. Partridge, Ralph F. Meyer, Royston Rayzor et al., Corpus Christi, TX, Richard Anthony Branca, Royston Rayzor Vickery & Williams LLP, Houston, TX, for HNA Group Co., Ltd., et al.

*MEMORANDUM AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS AND MOTION TO VACATE ATTACHMENT*

BRIAN L. OWSLEY, United States Magistrate Judge.

**\*1** This is an admiralty action filed pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure and the Federal Arbitration Act, 9 U.S.C. §§ 4, 8 in aid of maritime arbitration by Plaintiff White Rosebay Shipping S.A ("White Rosebay"). (D.E.1). Pending is a Motion to Dismiss and Motion to Vacate Attachment filed by Defendants Offshore Heavy Transport AS ("OHT") and OHT Osprey AS ("OHT Osprey"), (D.E.31), and a Motion To Vacate Attachment filed by Defendants HNA Group Co. Ltd. ("HNA"), Hong Kong China Glory Ltd. ("Chain Glory"), and Grand China Shipping Development Co. a/k/a Shanghai Grand China Shipping Development Co. ("Grand China"). (D.E.33). OHT and OHT Osprey contend that Plaintiff has failed to allege sufficient facts to establish a plausible claim that they should be subject to alter ego liability for the conduct of Defendants HNA, China Glory, and Grand China. OHT and OHT Osprey also seek to vacate attachment of the M/V Osprey, arguing that Plaintiff

has not satisfied the requirements pursuant to Rule B. (D .E. 31). Defendants HNA, Chain Glory, and Grand China seek to vacate attachment on the same grounds. (D.E.33). Plaintiff has filed responses opposing dismissal and vacating attachment. (D.E. 37; D.E. 38; D.E. 46). Defendants have countered with replies. (D.E. 42; D .E. 56). For the following reasons, it is respectfully recommended that Defendants' motions be granted and that this action be dismissed.

## I. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1333 over maritime claims.

## II. BACKGROUND

On July 20, 2010, Defendant Chain Glory entered into an agreement with Plaintiff to time charter its vessel, the M/V Fortune Plum. (D.E. 1, at 3). The agreement was guaranteed by Defendant Grand China. *Id.* Both Chain Glory and Grand China are owned by an HNA subsidiary, non-party Grand China Logistics Holding (Group) Company Limited ("GC Logistics"), which serves as the holding company through which HNA operates its shipping business. [1] *Id* . at 2; (D.E. 1–4, at 2). Pursuant to the terms of the agreement, Chain Glory was obligated to make charter hire payments each month at the rate of $17,700 per day, beginning on July 23, 2010 when the vessel was delivered to it. *Id.* However, in April 2011, Chain Glory began to default on the contract, failing to make installment payments on time or in full. *Id.* By September 2011, it owed a total of $1,050,711 in back charter hire payments. *Id.* at 3–4. Shortly thereafter, it stopped making payments altogether. *Id.*

[1] GC Logistics has not been named as a defendant in this action. On March 22, 2012, just six days before this action was commenced, it registered to do business in Texas. (D.E. 1–11, at 2).

On October 13, 2011, Plaintiff made a statutory demand that Chain Glory be wound up pursuant to the law of the British Virgin Islands where it is incorporated. *Id.* During this time, Plaintiff received charter hire payments directly from Chain Glory's sub-charterers, thereby reducing the outstanding payments to $592,756.64. *Id.* On November 14, 2011, construing Chain Glory's failure to make payments as a constructive repudiation of the charter contract, Plaintiff

withdrew the M/V Fortune Plum from Chain Glory's service. *Id.* Because there were at least approximately 588 days remaining pursuant to the contract, Plaintiff attempted to mitigate its losses by re-fixing the vessel to a new charterer pursuant to a new charter. *Id.* It did so at a loss, however, and was only able to secure average daily rates of $9,674.51. *Id.* The difference in charter payments amounted to $4,270,643.62. *Id.* In addition, Plaintiff incurred $28,500 in damages related to recovery from Grand China's sub-charterer. *Id.*

### III. PROCEDURAL BACKGROUND

**\*2** On February 12, 2012, Plaintiff commenced an arbitration proceeding against Chain Glory in London pursuant to the terms of the charter contract, seeking damages totaling $6,348,844.84.[2] *Id.* at 5–6; (D.E.1–2). In order to obtain security for that proceeding, it instituted this action against Chain Glory on March 28, 2012, claiming that Chain Glory and its guarantor, Grand China, breached the charter contract by failing to meet their contractual obligations. (D.E. 1, at 2–3). After including interest and attorney's fees, the complaint asserts a recoverable amount totaling $6,348,844.84. *Id.* at 6. Plaintiff also seeks to hold HNA, the parent company of Chain Glory and Grand China, as well as two other subsidiaries, OHT and OHT Osprey, liable for breach of contract on the basis that an alter ego relationship existed between each of these corporations. *Id.* at 10–12.

[2]    Plaintiff also intends to commence litigation against Grand China in London. (D.E. 1, at 5).

Simultaneously, Plaintiff submitted a motion to seize the M/V Osprey, which was then within this Court's territorial jurisdiction.[3] (D.E.4). This motion was granted on March 29, 2012, and the vessel was seized. (D.E.8). OHT posted bond on March 30, 2012, (D.E.10), and Plaintiff consented to the release of the vessel. (D.E.22).

[3]    OHT Osprey is the sole owner of the M/V Osprey, and OHT is the sole owner of OHT Osprey. (D.E. 31, at 1).

Defendants OHT and OHT Osprey filed their answers on April 30, 2012. (D.E. 24; D.E. 25; D.E. 26). On July 20, 2012, they submitted this motion to dismiss and vacate attachment in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure and Supplemental Admiralty Rule E(4)(f). (D.E.31). On July 26, 2012, Defendants HNA, Chain Glory,

and Grand China also filed a motion to vacate attachment pursuant to Rule E(4)(f). (D.E.33).

On May 22, 2012, the London tribunal entered a First Final Award finding that Plaintiff was entitled to recover $492,338.09 for unpaid hire that accrued prior to the termination of the contract as well as additional fees, reserving the question of interest. *White Rosebay Shipping S.A. v. HNA Group Co. Ltd.,* No. 2:12–CV–183 (S.D. Tex. June 4, 2012) (complaint). Plaintiff subsequently initiated an additional proceeding on June 4, 2012, to enforce the award against Chain Glory, as well as HNA, GC Logistics, Grand China, OHT and OHT Osprey as alter egos. *Id.* at *1.

### IV. DISCUSSION

A motion to dismiss pursuant to Rule 12 is to be distinguished from a motion to vacate an attachment pursuant to Rule E(4)(f). Although Rule E(4)(f) establishes the procedure for releasing seized property from an arrest or attachment, it does not provide for dismissal of the action. *Chiquita Int'l Ltd. v. MV Bosse,* 518 F.Supp.2d 589, 596 (S.D.N.Y.2007); *see also Vitol, S.A. v. Capri Marine, Ltd.,* No. 09–3430, 2011 WL 5577618, at *2 (D.Md. Aug.22, 2011) (unpublished) ("it is at least theoretically possible that a Complaint adequate to withstand a Rule 12(b)(6) motion may, nevertheless, not be adequate to avoid the vacatur of an attachment"). Instead, Rule 12 is the proper vehicle by which a party moves to dismiss. *Chiquita Int'l Ltd.,* 518 F.Supp.2d at 596 (citing Fed.R.Civ.P. 12). Defendants have invoked both Rule E(4)(f) and Rule 12(b)(6), urging for vacatur of the attachment order as well as for the dismissal of the action against them. (D.E. 31, at 1).

### A. Dismissal Is Warranted Because Plaintiff Has Failed To State A Claim.

**\*3** OHT and OHT Osprey argue that Plaintiff's claims must be dismissed because it has failed to allege sufficient facts to establish its alter ego theory that would provide a basis for holding Defendants liable.

### 1. Standard for motion to dismiss pursuant to Rule 12(b)(6) and Rule 12(c).

Because Defendants submitted this motion to dismiss after filing their answers, it is first respectfully recommended that their Rule 12(b)(6) motion be construed as a motion for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure. *See Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999) (per curiam) (treating Rule 12(b)(6) motion filed after the responsive pleadings as a Rule 12(c) motion); *see also* Fed.R.Civ.P. 12(h)(2)(B). A Rule 12(c) motion for judgment on the pleadings is subject to the same standard as a Rule 12(b)(6) motion to dismiss. *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.2008) (citations omitted).

Rule 12(b)(6) authorizes courts to dismiss claims for failure to state a legally cognizable claim that is plausible. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,* 594 F.3d 383, 387 (5th Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). When ruling on a Rule 12(b)(6) motion, a court must accept the plaintiff's factual allegations as true and view them in the light most favorable to the plaintiff. *Capital Parks, Inc. v. Se. Adver. & Sales Sys., Inc.,* 30 F.3d 627, 629 (5th Cir.1994) (citation omitted); *see also Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations."). A court may not look beyond the face of the pleadings to determine whether relief can be granted based on the alleged facts. *Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999) (citation omitted); *see also* Fed.R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

In order to withstand a Rule 12(b)(6) motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). This obligation to provide minimally sufficient facts on which legal relief can be granted is not satisfied by advancing unsupported "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)); *see also Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir.1995) (citation omitted) ("conclusory allegations ... masquerading as factual conclusions will not suffice to prevent a motion to dismiss."). Even the allegation of "facts that are 'merely consistent with' a defendant's liability" will not suffice. *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 557). According to the Supreme Court, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."*Id.* (citing *Twombly,* 550 U.S. at 556);*see also Twombly,* 550 U.S. at 561 (rejecting the "no set of facts" standard enunciated in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) because it permitted the survival of "a wholly conclusory statement of claim ... whenever the pleadings left open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery").

**\*4** By authorizing dismissal on the basis of some dispositive issue of law, the Rule 12(b)(6) pleading test dispenses with "needless discovery and factfinding" for the ultimate purpose of streamlining litigation. *Nietzke,* 490 U.S. at 326–27. The Fifth Circuit has specified that " '[d]ismissal is proper if the complaint lacks an allegation regarding a required element necessary to obtain relief.'"*Torch Liquidating Trust ex rel. Bridge Associates L.L.C. v. Stockstill,* 561 F.3d 377, 384 (5th Cir.2009) (quoting *Campbell,* 43 F.3d at 975). Moreover, a "court is not required to 'conjure up unpled allegations or construe elaborately arcane scripts to' save a complaint."*Campbell,* 43 F.3d at 975 (quoting *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988)).

## 2. Plaintiff has not pled sufficient facts establishing an alter ego claim against Defendants OHT and OHT Osprey to survive a Rule 12(c) motion.

Federal courts sitting in admiralty "can pierce the corporate veil of a corporation in order to reach the 'alter egos' of the corporate defendant directly involved."*Talen's Landing, Inc. v. M/V Venture, II,* 656 F.2d 1157, 1160 (5th Cir. Unit A Sept.1981) (citing *Swift & Co. Packers v. Compania Colombiana Del Caribe S.A.,* 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206 (1950))."Under the alter ego doctrine, a corporation may be bound by an agreement entered into by its subsidiary regardless of the agreement's structure or the subsidiary's attempts to bind itself alone to its terms, 'when their conduct demonstrates a virtual abandonment of separateness.'"*Bridas S.A.P.I.C. v. Gov't of Turkmenistan (Bridas I ),* 345 F.3d 347, 358–59 (5th Cir.2003) (citation omitted). Nevertheless, "[t]he alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases."*Bridas S.A.P.I.C. v. Gov't of Turkmenistan (Bridas II ),* 447 F.3d 411, 416 (5th Cir.2006) (citation omitted). Federal common law supplies the substantive law governing the resolution of an alter ego claim in the context of a maritime action. *Ost–West–Handel Bruno Bischoff GmbH v. Project Asia Line, Inc.,* 160 F.3d 170, 174 (4th Cir.1998) (citations omitted); *Chan v. Society Expeditions, Inc.,* 123 F.3d 1287, 1294 (9th Cir.1997)

(citation omitted); *see also Century Hotels v. United States,* 952 F.2d 107, 110 n. 4 (5th Cir.1992) ("State and federal alter ego tests are essentially the same. Our non-diversity alter ego cases rarely state whether a state or federal standard controls, and apply state and federal cases interchangeably.") (citation omitted).

Generally, the corporate veil is pierced "only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil."[4] *Bridas I,* 345 F.3d at 359 (citing *American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir.1997)). Although the Fifth Circuit has not addressed whether federal common law permits a subsidiary to be held liable for the parent corporation's obligations, the court has indicated that there is little conceptual difference between the test for forward as opposed to reverse veil piercing. *See Chao v. Occupational Safety & Health Review Comm'n,* 401 F.3d 355, 364 (5th Cir.2005) (explaining that " '[t]his slight variation is of no consequence, however, because the end result under both views is the same-two separate entities merge into one for liability purposes' ") (quoting *Maiz v. Virani,* 311 F.3d 334, 346 n. 11 (5th Cir.2002)).

[4] Plaintiff argues that it need not show fraud pursuant to federal *maritime* veil-piercing law, as opposed to federal common law. (D.E. 37, at 3–7). In support, it cites to case law that is not binding in this Circuit. *See, e.g., Northern Tankers (Cyprus) Ltd. v. Backstrom,* 967 F.Supp. 1391, 1399–1401 (D.Conn.1997); *Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 342 (2d Cir.1986). It goes on to suggest that these cases apply because federal maritime law must be uniform throughout all federal courts. (D.E. 37, at 5–6). Although it is true that the purpose of adopting federal common law —maritime or otherwise—is to promote uniformity, this does not preclude the possibility that different circuits may adopt varying interpretations of federal law because the only common binding precedent among each circuit is that of the Supreme Court. Therefore, because courts in the Fifth Circuit have never drawn a distinction between federal common law and maritime law in the context of veil piercing, it is inappropriate to do so here, regardless of any precedent from the District of Connecticut or the Second Circuit. *See Talen's Landing, Inc.,* 656 F.2d at 1161 n. 6 (explaining that " '[u]nder both [State] law and federal common law, [ ] a finding of control or domination of a corporation ... and the use of the corporate fiction are necessary prerequisites,' " and that " '[o]nce such a connection is established,

it is [only] appropriate to brush aside the corporate veil when it appears a corporation was organized for fraudulent purposes, illegality, or wrongdoing' ") (quoting *Bordagain Shipping Co. v. Saudi–American Lines, S.A.,* 1979 A.M.C. 1058, 1071–72 (E.D.La.1978)) (citations omitted); *Naftomar Shipping & Trading Co. v. KMA Int'l S.A.,* No. V–11–2, 2011 WL 888951, at *4 (S.D.Tex. Mar.10, 2011)* (unpublished) (maritime case in which the court noted that "[t]he alter ego doctrine applies only if: '(1) the owner exercised complete control ...*and* (2) such control was used to commit a fraud or wrong' ") (quoting *Bridas I,* 345 F.3d at 359) (emphasis added). Accordingly, Plaintiff is required to allege fraud, illegality or misuse of the corporate form by Defendants.

**\*5** In *American Fuel Corp.,* which the Fifth Circuit adopted as its own two-prong approach to corporate veil piercing issues in *Bridas I,* 345 F.3d at 359, the Second Circuit recognized that " '[w]hile complete domination of the corporation is the key to piercing the corporate veil, ... such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required.' " 122 F.3d at 134 (citation omitted). The Fifth Circuit has subsequently explained that this injustice requirement can be met by showing fraud, an illegal act, or a misuse of the corporate form. *Bridas II,* 447 F.3d at 416– 17 (citing *In re Sims,* 994 F.2d 210, 217–18 (5th Cir.1993); *United States v. Jon–T Chems., Inc.,* 768 F.2d 686 (5th Cir.1985); *Edwards Co. v. Monogram Indus., Inc.,* 730 F.2d 977, 984 (5th Cir.1984)).

Here, Plaintiff alleges that Defendants constitute a single business enterprise pursuing their business objectives through nominally separate business structures, all of which are dominated and controlled by HNA, which is a parent company of Chain Glory, Grand China, OHT, and OHT Osprey. Specifically, Plaintiff alleges that HNA controlled these subsidiaries through another subsidiary, non-party GC Logistics, which owns both Chain Glory and Grand China, and acquired a 60% ownership interest in OHT in September, 2010. OHT wholly owns OHT Osprey. Accordingly, Plaintiff seeks to hold OHT and OHT Osprey liable as subsidiaries. Because Plaintiff's claim relies on a combination of forward and reverse veil piercing theories, it must first show that HNA is liable for Chain Glory's obligations and then show that OHT and OHT Osprey, in turn, are liable for HNA's obligations. Plaintiff's alter ego theory rests on the following allegations: (1) HNA is the funding conduit for all activities of its subsidiaries; (2) HNA representatives, acting on behalf of Chain Glory, represented that they had the financial backing

of HNA in chartering the M/V Fortune Plum through a PowerPoint prospectus, Chain Glory's use of HNA's logo, and an email; (3) HNA provided cash injections into its subsidiaries unless, as in the case of Chain Glory, they did not perform as hoped; (4) all Defendants routinely pay off and guarantee each other's debts using HNA Group controlled funds; (5) HNA is the beneficial majority owner of OHT and OHT Osprey; (6) the non-party GC Logistics is the 60% owner of OHT; (7) HNA installed directors on OHT's Board who are directors of other HNA subsidiaries; (8) HNA treats OHT as it has its other subsidiaries; (9) HNA's subsidiaries are undercapitalized; and (10) HNA funded GC Logistics' purchase of OHT by using funds otherwise available to satisfy the M/V Fortune Plum charter hire. Assuming *arguendo* that these facts create a plausible inference that HNA exercised dominion and control over its subsidiaries, Plaintiff has failed to show how it used its control over OHT to commit the alleged wrong underlying this action through fraud, illegality, or abuse of the corporate form.

**\*6** First, Plaintiff has not alleged facts indicating that HNA's control over OHT amounted to an illegal act or fraud. For example, it does not contend that they caused Grand China to breach the charter contract. Indeed, the complaint attributes HNA's decision to stop funding Grand China as the sole reason for the breach. Moreover, Plaintiff does not suggest that the existence of OHT and OHT Osprey contributed to its inability to recover on its breach of contract claim against HNA. Thus, OHT and OHT Osprey are only in this action because they are purportedly controlled by HNA and because they possess valuable assets, including the M/V Osprey.

Plaintiff attempts to argue that HNA induced it to enter into the agreement with Chain Glory through representations made by non-party GC Logistics that Chain Glory was well-funded and financially backed by HNA. Specifically, it points to a PowerPoint prospectus discussing GC Logistics' control over Chain Glory and Grand China, as well as various other subsidiaries. In addition, according to the affidavit of Plaintiff's Executive Vice President, Hirokazu Matsuo, Plaintiff was misled by "[g]eneral market perceptions, particularly the 'HNA' logo that was used for various documentation and advertising," as well as a July 12, 2010 email sent to Plaintiff describing Grand China as being a subsidiary of the fourth largest airline in China. (D.E. 38–1, at 2).

While there may be scenarios in which a parent corporation does in fact induce its clients into forming contracts with

wholly subservient and undercapitalized subsidiaries on the incorrect understanding that they are dealing with a single corporate entity, this is not the case here. Plaintiff does not dispute that it entered into a valid contract with Chain Glory that was guaranteed by Grand China, and which made no mention of HNA, GC Logistics, OHT, or OHT Osprey. Given that Plaintiff appears to be a sophisticated business entity that had an attorney prepare as well as review the charter contract with Grand China, (D.E.1–1), it is unlikely that it was unaware of the risks inherent in contracting with a subsidiary rather than a parent corporation. *See United States ex rel. Steury v. Cardinal Health, Inc.,* 625 F.3d 262, 270 (5th Cir.2010) (affirming dismissal of a fraud claim pursuant to the False Claims Act on a Rule 12(b)(6) motion when the facts alleged in the complaint supported an "equally likely inference" that the government understood the pertinent risks and was not misled by the defendant). To the extent Plaintiff did not appreciate these risks due to the representations by Defendants or GC Logistics, its reliance was unreasonable. *See Boggan v. Data Sys. Network Corp.,* 969 F.2d 149, 153 (5th Cir.1992) (pursuant to Texas common law, plaintiff's reliance on oral representations prior to execution of contract were unreasonable given that he signed an agreement with the assistance of counsel and an accountant). However, even if Plaintiff was, as it claims, fraudulently induced into entering the charter contract under the mistaken belief that HNA would essentially serve as guarantor, any such fraud, standing alone, falls short of implicating OHT or OHT Osprey. Accordingly, it is respectfully recommended that Plaintiff has failed to "state with particularity the circumstances constituting fraud" as required by Rule 9(b) of the Federal Rules of Civil Procedure. *See United States ex rel. Thompson v. Columbia/ HCA Healthcare Corp.,* 125 F.3d 899, 903 (5th Cir.1997) ("At a minimum, Rule 9(b) requires that a plaintiff set forth the 'who, what, when, where, and how' of the alleged fraud.").

**\*7** Second, Plaintiff asserts that Defendants are abusing the corporate form by playing a "shell game" in which HNA selectively funds or abandons its subsidiaries depending on their profitability, and transfers its assets from company to company to avoid obligations. Although these allegations would sufficiently establish abuse of the corporate form if supported by plausible facts, Plaintiff has failed in this regard. Richard Squire, *Strategic Liability In The Corporate Group,* 78 U. Chi. L.Rev. 605, 612 (2011) ("managers of corporate groups abuse the subsidiary boundaries by playing a kind of carnival shell game, shifting assets around to keep them away from creditors") (citation omitted); *see also Bridas II,*

447 F.3d at 417 (manipulation of a corporation to prevent recovery of damages satisfied the "fraud or injustice" prong) (citing *Patin v. Thoroughbred Power Boats, Inc.,* 294 F.3d 640, 648–49 (5th Cir.2002)). Although Plaintiff expresses the opinion that HNA "should have" allocated the funding it used to purchase OHT to support Grand China, instead, (D.E. 37, at 17), the record indicates that the acquisition of OHT was an unrelated business transaction. For example, Mr. Matsuo submitted an affidavit swearing that to his understanding, HNA purchased OHT a few months after the charter contract began, while Chain Glory still owed amounts pursuant to the agreement for the remainder of the contract term.[5] (D.E. 38–1, at 3). Based on this time line, Chain Glory was still months away from defaulting on its obligations. By Plaintiff's logic, *any* business transaction between a parent corporation and an unrelated subsidiary that occurs while another subsidiary maintains *any* contractual relations with a third party would provide a basis for piercing the veil. The law does not dictate ordinary business decisions in this manner. Typically, an improper transfer of assets between corporations for the purpose of avoiding liability occurs when there is an actual debt or money judgment owed or imminent, not merely when there is a preexisting contractual obligation. *See, e.g., District Council No. 9 v. APC Painting, Inc.,* 272 F.Supp.2d 229, 241 (S.D.N.Y.2003) (misuse of corporate form alleged when defendant dissolved one of his corporate entities shortly after a final arbitration award was issued against him); *JSC Foreign Economic Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.,* 295 F.Supp.2d 366, 378 (S.D.N.Y.2003) (same); *Rolls–Royce Motor Cars, Inc. v. Schudroff,* 929 F.Supp. 117, 122 (S.D.N.Y.1996) (misuse of corporate form alleged when defendant transferred assets to prevent subsidiary's creditors from reaching funds).

[5]    Evidence submitted by Plaintiff, including a press release from the GC Logistics website, indicates that GC Logistics became the 60% shareholder of OHT on September 20, 2010. (D.E. 1–10, at 9).

Moreover, HNA's alleged refusal to further fund its unprofitable subsidiary Grand China does not, by itself, constitute an abuse of the corporate form." 'The corporate structure is an artificial construct of the law, a substantial purpose of which is to create an incentive for investment by limiting [a shareholder's] exposure to personal liability' for the corporation's debts and obligations."*NLRB v. Bolivar–Tees, Inc.,* 551 F.3d 722, 727 (8th Cir.2008) (quoting *NLRB v. Greater Kansas City Roofing,* 2 F.3d 1047, 1051 (10th Cir.1993)). Even the Supreme Court has acknowledged that "[t]he insulation of a stockholder from the debts

and obligations of his corporation is the norm, not the exception."*NLRB v. Deena Artware, Inc.,* 361 U.S. 398, 402–03, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960) (citation omitted). Plaintiff's position that a parent corporation must continue supporting a doomed subsidiary with regular cash transfusions, however, is inconsistent with the very notion of limited liability-limitation of the risk of loss from an investment. *See* David Millon, *Piercing The Corporate Veil, Financial Responsibility, And the Limits Of Limited Liability,* 56 Emory L.J. 1305, 1338–39 (2007) ("If ... shareholders are expected not only to contribute initially but also to maintain at all times a particular net worth in the corporation for the benefit of corporate creditors, such a requirement would not differ fundamentally from a rule of unlimited liability.") (citation omitted); Timothy P. Glynn, *Beyond "Unlimiting" Shareholder Liability: Vicarious Tort Liability For Corporate Officers,* 57 Vand. L.Rev. 329, 354–55 (2004) ("But undercapitalization, by itself, cannot justify piercing, because limited shareholder liability is a license to undercapitalize. This is why promoters and investors incorporate in the first place, and why corporations form most subsidiaries.") (citations omitted). Plaintiff has provided no case law that treats the refusal to contribute funds to a corporation as an abuse of the corporate form, and an independent research into this issue has uncovered no such authority. In the absence of case law support, it is simply not clear how requiring parent corporations to cannibalize their profitable, asset-rich subsidiaries in order to prop up a separate failing business venture would further the interests of justice. While a subsidiary that requires regular funding in order to survive may "not have any separate financial existence" apart from the parent corporation, *Jon–T Chems.,* 768 F.2d at 694, this consideration is not relevant to the distinct question of whether any injustice resulted from the refusal to continue making such payments.

**\*8** In sum, even if HNA and its subsidiaries did in fact operate as a single business enterprise as Plaintiff has alleged, the failure to further plead facts showing that such domination caused it to suffer from an injustice by means of a fraud, illegality, or a misuse of the corporate form precludes its veil piercing efforts. Because the complaint lacks sufficient facts to demonstrate a legally cognizable injustice, it is respectfully recommended that Plaintiff has failed to show that the corporate veils of OHT and OHT Osprey should be pierced.

### 3. Dismissal is warranted.

Plaintiff has not stated a claim on which relief can be granted. Unless and until it presents enough facts to overcome a Rule 12(b) (6) or Rule 12(c) motion, it makes no sense to proceed with discovery because the truth of those alleged facts would not warrant legal recourse. *See Iqbal, 556 U.S. at 686* ("Because respondent's complaint is deficient under Rule 8 [requiring a short and plain statement of the claim showing that the pleader is entitled to relief], he is not entitled to discovery, cabined or otherwise."). In particular, Plaintiff has failed to allege fraud or misuse of the corporate form by HNA in a manner that provides a basis for reaching the assets of OHT and OHT Osprey. Therefore, it is respectfully recommended that OHT and OHT Osprey be dismissed from this action. By implication, the dismissal of OHT and OHT Osprey from the action would serve to vacate the attachment. *See Man Diesel A/S v. Seahawk North Am. LLC, No. 09 CV 0687, 2009 WL 3030220, at *1 n. 1 (S.D.N.Y. Sept. 22, 2009)* (unpublished) ("When the underlying action is dismissed, the attachment is necessarily vacated.") (citation omitted).

### B. Defendants' Motion To Vacate Attachment Should Be Denied.

In the alternative, in the event that Plaintiff has pleaded sufficient facts to establish a basis for piercing the corporate veil to survive Rule 12(b)(6) or Rule 12(b)(c), Defendants OHT and OHT Osprey seek to vacate the writ of attachment against the M/V Osprey pursuant to Rule E(4)(f) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions. (D.E.31). Defendants allege that Plaintiff has failed to establish a *prima facie* case for attachment because, if its alter-ego theory succeeds, then non-party GC Logistics destroys the basis for attachment pursuant to Rule B. Specifically, because GC Logistics is registered to do business in Texas, it is "found" in the forum. As an alter ego of Defendants, its presence is imputed to them and dissolves attachment. Defendants HNA, Chain Glory, and Grand China have filed a motion to vacate attachment on identical grounds. (D.E.33).

### 1. Standard for a motion to vacate pursuant to Rule E of the Supplemental Rules for Admiralty and Maritime Procedure.

Supplemental Rule E provides for release of a vessel from arrest or attachment in a maritime proceeding:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

**\*9** Fed.R.Civ.P. Supp. E(4)(f). While Plaintiff carries the burden of showing why the arrest should not be vacated, the procedure "is not intended to resolve definitively the dispute between the parties, but only to make a preliminary determination whether there were reasonable grounds for issuing the arrest warrant ." *Salazar v. Atlantic Sun, 881 F.2d 73, 79 (3d Cir.1989)*; *see also Naftomar Shipping & Trading, 2011 WL 888951, at *3* (applying "reasonable grounds/ probable cause" standard for Rule E motion to vacate, explaining that Rule E(4)(f) determinations establish " 'that it is *likely'* that the alleged facts are true .") (quoting *Wajilam Exports (Singapore) Pte Ltd. v. ATL Shipping Ltd., 475 F.Supp.2d 275, 280 (S.D.N.Y.2006)*) (emphasis in original). Accordingly, Plaintiff can only survive a motion to vacate by showing by a preponderance of evidence that it is entitled to attachment.*Vinmar Int'l Ltd. v. M/T Clipper MAKISHIO, No. H–09–3829, 2009 WL 6567104, at *1 (S.D.Tex. Dec.9, 2009)* (unpublished) (citing *Seatrade Group N.V. v. 6,785.5 Tons of Cement, No. H–05–2771, 2005 WL 3878026, at *2 (S.D.Tex. Dec.6, 2005)* (unpublished)).

### 2. The attachment should be vacated if GC Logistics was subject to personal jurisdiction at the time the complaint was filed .

Pursuant to Rule E(4)(f), once a defendant moves to vacate an attachment, " 'a district court must [grant it] if the plaintiff fails to sustain his burden of showing that he has satisfied the requirements of Rule B and Rule E.' " *Naftomar Shipping & Trading, 2011 WL 888951, at *2* (citation omitted). To support the attachment of a vessel pursuant to Rule B, a plaintiff must show that: "(1) [it] has a valid *prima facie* admiralty claim against the defendant; (2) the defendant cannot be found within the district; (3) the defendant's property may be found within the district; and (4) there is no statutory or maritime law bar to the attachment." [6] *Id.* (citing *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd., 460 F.3d 434, 445 (2d Cir.2006), overruled on other grounds by Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58, 61 (2d Cir.2009)*). A defendant cannot be "found" in a district if, at the time the complaint is filed, it is not present. *Heidmar, Inc. v. Anomina Ravennate Di Armamento Sp.A. of Ravenna, 132 F.3d 264, 268 (5th Cir.1998).* [7] As the

Fifth Circuit further explained, "[a] defendant is present in the district if 1) the defendant can be found within the district in terms of jurisdiction, and 2) the defendant can be found within the district for service of process." *Id.* (citing *LaBanca v. Ostermunchner,* 664 F.2d 65, 67 (5th Cir.1981)).

6    Rule B(1)(a) of the Supplemental Rules for Admiralty and Maritime Claims provides, in relevant part: "If a defendant is not found within the district when a verified complaint praying for attachment ... [is] filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property—up to the amount sued for—in the hands of garnishees named in the process."

7    The Fifth Circuit also noted that subsequent appearance of a defendant in a district does not dissolve attachment, because otherwise a defendant would be permitted to wait until a plaintiff files a complaint and then appoint an agent in the district to defeat attachment. *Heidmar, Inc.,* 132 F.3d at 268 (citing *Swift & Co. Packers,* 339 U.S. at 693). The time-of-filing rule for determining whether a defendant can be found in the district better serves the interests of fairness and judicial economy. *Id.*

Here, Defendants contend that Plaintiff has failed to carry its burden in one critical regard, which is that Plaintiff cannot show that at the time of attachment none of the Defendants could be "found" in the district.[8] Specifically, because GC Logistics registered to do business in Texas six days before Plaintiff's complaint was filed, it therefore could be "found" in the district. Moreover, if Plaintiff were successful in establishing its alter ego theory, GC Logistics, as the subsidiary of HNA and parent of Chain Glory, Grand China, OHT, and OHT Osprey, would be an alter ego of all these companies. Though it is a nonparty, its presence in the district extends to all alleged alter egos, rendering those companies present in the district as well. (D.E. 33, at 7). Accordingly, even without joining GC Logistics as a defendant, the fact that it is registered to do business in Texas bars attachment.

8    OHT and OHT Osprey contend that Plaintiff has failed to show that it has a *prima facie* admiralty claim against it because it has not established its veil-piercing theory. (D.E. 31, at 8). Because this issue was addressed pursuant to the motion to dismiss analysis, that discussion need not be repeated here. As already noted, by implication Plaintiff has not met the heightened pleading requirement of Rule E.

**\*10** In response, Plaintiff contends that any party not named as a defendant is not implicated in the Rule B analysis, and that it is not required to add GC Logistics as a defendant. It argues that it is not obligated to pierce the corporate veils of *all* companies in the HNA family simply because it seeks to do so for a select few. According to Plaintiff, veil piercing does not create an independent cause of action against a parent company that is not the primary defendant. Rather, it is a procedural mechanism that allows courts to impose liability based on an underlying cause of action, which need not be proven against the parent. Plaintiff argues that otherwise, a plaintiff would never be able to pierce the corporate veil of a parent corporation because it could always insulate itself from liability by forming a "middleman" company, like GC Logistics. As a result, the parent company would never be held liable for the wrongful conduct of its sub-subsidiaries. In addition, Plaintiff contends that a member of a corporate group, even if it is an alter ego, is not a necessary party to a veil-piercing action pursuant to Rule 19 of the Federal Rules of Civil Procedure.

The question of whether Plaintiff has succeeded in carrying its burden pursuant to Rule E(f)(f) depends on whether GC Logistics could be found in the district. If it can, then despite Plaintiff's arguments, its presence—even as a non-party—destroys Plaintiff's basis for attachment.

### i. The minimum contacts of one entity can be imputed to its alter egos for the purpose of establishing personal jurisdiction.

The purpose of piercing the corporate veil is to provide a remedy to a plaintiff that would otherwise be unavailable through a primary defendant, by allowing it to reach the assets of a non-primary defendant under certain, extraordinary circumstances. *See Matter of S.I. Acquisitions, Inc.,* 817 F.2d 1142, 1152 n. 11 (5th Cir.1987) (citation omitted); Am.Jur.2d Corporations 47 (piercing corporate veil) (citations omitted). One specific method for piercing the corporate veil is through the alter ego theory, which essentially establishes that all companies in a corporate group be treated as one and the same. *See Krivo Indus. Supply Co. v. Nat'l Distillers & Chem. Corp.,* 483 F.2d 1098, 1102–03 (5th Cir.1973) (explaining that "since the dominant corporation has misused the subservient corporation's corporate form ... the debts of the subservient corporation are in reality the obligations of the dominant corporation," and that " 'the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist.'") (quoting *United States v. Reading Co.,* 253 U.S. 26, 63, 40 S.Ct.

425, 64 L.Ed. 760 (1920) (citations omitted)). Thus, while a plaintiff need not prove the underlying contract claim against each non-primary defendant—i.e., Plaintiff need not show that HNA breached the charter hire contract—once an alter ego relationship is established, each non-primary defendant can be held liable *as if* it were the primary defendant.

**\*11** On the other hand, maritime attachment is a mechanism that secures a plaintiff's ability to recover against a primary defendant in a forum in which it would otherwise be unable to do so by directly reaching the defendant's assets. As the Fifth Circuit has explained, "attachment serves two purposes: 1) securing the defendant's appearance and 2) assuring satisfaction in case the plaintiff's suit is successful." *Heidmar, Inc.,* 132 F.3d at 268 (citing *Swift & Co. Packers,* 339 U.S. at 684). Accordingly, attachment is partially justified on jurisdictional grounds: because a defendant would otherwise not be subject to personal jurisdiction, it would not be required to appear before the court. Therefore, the requirement that a defendant "cannot be found" within a district exists to provide a justification for asserting jurisdiction over the defendant's property rather than his person. *See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.,* 923 F.2d 380, 391 (5th Cir.1991) (explaining that "[q]uasi in rem actions are based on a claim for money begun by attachment or other seizure of property *when the district court has no jurisdiction over the person of the defendant,* but has jurisdiction over either property that the court can apply to the satisfaction of the defendant's debt or persons," and that "the court may exercise quasi in rem jurisdiction to the extent that it has jurisdiction over an item belonging to the defendant.") (emphasis added) (citing *Belcher Co. Of Alabama v. M/V Maranatha Mariner,* 724 F.2d 1161, 1163–64 (5th Cir.1984)).

The implications of this distinction means that if Plaintiff wishes to secure the assets of a subsidiary company, that subsidiary must be either a primary defendant or indirectly primarily liable as an alter ego. However, Plaintiff's alter ego theory cannot succeed without the finding, implicit or otherwise, that GC Logistics is the alter ego of Defendants, because GC Logistics is a key player in the alleged control and fraud by HNA. For example, GC Logistics is the middleman between HNA and its shipping sub-subsidiaries; it wholly owns Chain Glory and Grand China, and owns 60% of OHT. In addition, HNA made its allegedly fraudulent representations through GC Logistics, and GC Logistics was

responsible for acquiring OHT with HNA funds. While this does not mean GC Logistics must necessarily be named as a defendant, it *does* mean that its presence in the district can be imputed to all other Defendants for the purpose of establishing the presence of *those* companies, thereby destroying the jurisdictional basis for attachment. *See Glory Wealth Shipping Pte Ltd. v. Industrial Carriers, Inc.,* 590 F.Supp.2d 562, 564 (S.D.N.Y.2008) ("if one defendant is present in the district for the purposes of issuing a maritime attachment, its alter egos are present as well"). The status of GC Logistics as a non-party makes it no less an alter ego of HNA, Chain Glory, Grand China, OHT, or OHT Osprey. Rather, it simply means that Plaintiff cannot recover from GC Logistics in this action.

**\*12** This conclusion is supported by two considerations, in particular. First, courts have allowed plaintiffs to establish personal jurisdiction over alter corporations that would otherwise not be subject to personal jurisdiction in the forum, on the basis that one of the alter ego entities named as a defendant is subject to jurisdiction. *Freudensprung v. Offshore Technical Servs., Inc.,* 379 F.3d 327, 346 (5th Cir.2004) (explaining that despite the presumption of corporate separateness, alter ego corporations " 'fuse ... together for jurisdictional purposes.' ") (quoting *Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1160 (5th Cir.1983)) (citation omitted). In essence, courts have imputed the minimum contacts of one corporation to all of its alter egos for the purposes of establishing *in personam* jurisdiction. *See Gemstar Group USA, Inc. v. Ferragamo USA, Inc.,* No. H–08–1822, 2008 WL 4858363, at \*5 (S.D.Tex. Nov.10, 2008) (unpublished) (explaining factors under which foreign parent company is amenable to jurisdiction based on conduct of subsidiary) (citing *Hargrave,* 710 F.2d at 1160); *Glory Wealth Shipping Pte Ltd.,* 590 F.Supp.2d at 564 ("Where one defendant is subject to personal jurisdiction and service of process, its alter egos are subject to personal jurisdiction and may be served by serving it.") (citation omitted). Thus, Plaintiff presumably has the option to bring Defendants into court in this district if GC Logistics is amenable to personal jurisdiction. [9]

9    Theoretically, it should not matter whether the corporation whose contacts form the basis of personal jurisdiction for its foreign sister or parent subsidiaries is named as a defendant. However, it is difficult to conceive of a situation in which a plaintiff could effect service on a subsidiary in its capacity as the alter ego of its parent or another subsidiary before a court has

ruled on whether to pierce the corporate veil, without naming the entity receiving service as a defendant. *See Glory Wealth Shipping Pte Ltd.,* 590 F.Supp.2d at 564 ("Where one defendant is subject to personal jurisdiction and service of process, its alter egos are subject to personal jurisdiction and *may be served by serving it.")* (citing *Wm. Passalacqua Builders, Inc. v. Resnick Dev. S., Inc.,* 933 F.2d 131, 142–43 (2d Cir.1991)) (emphasis added). By the same token, it is difficult to conceive of a reason for why Plaintiff did not name GC Logistics as a defendant in this action, other than to satisfy the Rule B requirement that no defendant be found in the district. Though Plaintiff is entitled to seek recovery against any defendant it likes, it should not be permitted to pick and choose among defendants for the purpose of circumventing the requirements of Rule B.

Second, in light of this conclusion, Plaintiff's proposition undermines one of the key purposes of allowing maritime attachment pursuant to Rule B, because Defendants need not be compelled to appear before the court through attachment of a *res. See Stena Rederi AB,* 923 F.2d at 391 (citing *Belcher Co. Of Alabama,* 724 F.2d at 1163–64). Although this conclusion permits a defendant to make itself present in the district solely to avoid future attachment actions against its sibling and parent corporations, such strategic maneuvering does not bar a plaintiff from recovering. Indeed, it can still proceed against the defendants *in personam* without attachment of the property. To the extent Plaintiff seeks to satisfy the London arbitration order against Chain Glory, it has initiated separate proceedings specifically for that purpose. *See White Rosebay Shipping S.A. v. HNA Group Co. Ltd.,* No. 2:12–CV–183 (S.D. Tex. June 4, 2012) (complaint)

### ii. There is insufficient evidence to determine whether Defendants, through GC Logistics, were "present" in the district.

Defendants assume as part of their argument that the fact that GC Logistics registered to do business in Texas and appointed an agent for service six days before Plaintiff filed its complaint renders it present in the district for the purposes of destroying attachment. However, as already noted, the appropriate question is whether Defendants (vis-a-vis GC Logistics) were present in the district for the purposes of personal jurisdiction. Given the peculiar circumstances of the instant case, pursuant to Rule E(4)(f) the burden falls on Plaintiff to prove a negative: that GC Logistics did *not* have minimum contacts in the forum sufficient to render it "present" for the purposes of Rule B attachment.

**\*13** The Fifth Circuit has explained that "[a] federal court can exercise personal jurisdiction over a nonresident defendant if: (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) the exercise of such jurisdiction by the forum state is consistent with the due process under the United States Constitution."*Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir.1993) (citations omitted); *see also Wilson v. Belin,* 20 F.3d 644, 646–47 (5th Cir.1994) (citation omitted). Only the latter inquiry need be addressed, however, because the Texas long-arm statute extends to the limits of federal due process. *See Moncrief Oil Int'l Inc. v. OAO Gazprom,* 481 F.3d 309, 311 n. 1 (5th Cir.2007) ("The Texas long-arm statute extends personal jurisdiction to the permissible limits of the Due Process Clause, and so we only need to determine whether the exercise of personal jurisdiction in this case would comport with those federal guarantees.") (citations omitted); *see also*Tex. Civ. Prac. & Rem.Code § 17.041, *et seq.* (Texas Long Arm Statute).

The Fifth Circuit has determined that "[t]he Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant if: 1) that defendant has 'minimum contacts' with the forum state; and 2) the exercise of jurisdiction does not offend 'traditional notions of fair play and substantial justice.'"*Brown v. Slenker,* 220 F.3d 411, 417 (5th Cir.2000) (citing *Ruston Gas Turbines,* 9 F.3d at 418). For a federal court to exercise personal jurisdiction, "[b]oth prongs of the due process test must be met."*Ruston Gas Turbines,* 9 F.3d at 418. Once a plaintiff makes a *prima facie* showing of minimum contacts pursuant to the first prong, the burden then shifts to the defendant to show that "the exercise of jurisdiction would not comply with 'fair play' and 'substantial justice.' "*Freudensprung,* 379 F.3d at 343 (citing *Nuovo Pignone, SpA v. STORMAN ASIA M/V,* 310 F.3d 374, 378 (5th Cir.2002)).

To satisfy the "minimum contacts" prong of the test set forth above, the Supreme Court has established standards for "specific" and "general" jurisdiction. *Wilson,* 20 F.3d at 647; *Ruston Gas Turbines,* 9 F.3d at 418–19. A court may exercise "specific jurisdiction" over a non-resident defendant when the suit arises from or relates to the defendant's contacts with the forum state. *See Helicopteros Nacionales de Columbia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Freudensprung,* 379 F.3d at 343 ("A court may exercise specific jurisdiction when (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting

activities there; and (2) the controversy arises out of or is related to the defendants['] contacts with the forum state.") (citations omitted).

By contrast, when the act or transaction that forms the basis of the plaintiff's action is unrelated to the defendant's contacts with the forum, personal jurisdiction does not exist unless the defendant has sufficient "continuous and systematic" contacts with the forum state to support an exercise of "general jurisdiction." *Freudensprung,* 379 F.3d at 345 (citing *Helicopteros Nacionales de Columbia,* 466 U.S. at 414, 417). More specifically, a defendant's contacts with the forum state must be so continuous and systematic that the defendant should reasonably expect to be sued there. *See Felch,* 92 F.3d at 327; *Marathon Oil Co. v. A.G. Ruhrgas,* 182 F.3d 291, 295 (5th Cir.1999) (en banc) (per curiam) ("General personal jurisdiction is found when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial.") (citations omitted).

**\*14** Here, because Plaintiff's action did not arise out of Defendants' contacts with the forum, personal jurisdiction could only be established by showing that GC Logistics had continuous and systematic contacts sufficient for general jurisdiction, which could then be imputed to its alter egos. Despite Defendants' contentions, the mere fact that GC Logistics registered to do business in the forum is not conclusive. As the Fifth Circuit has explained, this factor carries " 'no special weight' in evaluating general personal jurisdiction." *Wenche Siemer v. Learjet Acquisition Corp.,* 966 F.2d 179, 181–82 (5th Cir.1992) (quoting *Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745, 748 (4th Cir.1971)). Absent other facts indicating a continuous and systematic presence in the forum-including, for example, that GC Logistics engaged in business, maintained an office, or had employees located in Texas–GC Logistics would not be subject to personal jurisdiction there. *See Gemstar Group USA, Inc.,* 2008 WL 4858363, at \*4 (citing *Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 445–46, 72 S.Ct. 413, 96 L.Ed. 485 (1952); *Cent. Freight Lines, Inc. v. APA Transp. Corp.,* 322 F.3d 376, 381 (5th Cir.2003)).

At this juncture, Plaintiff has failed to meet its burden pursuant to Rule E(4)(f) to survive Defendants' motion to vacate. Assuming Plaintiff succeeded in establishing its alter ego theory sufficient to entitle it to recover against the non-primary Defendants vis-a-vis piercing the corporate veil, it would necessarily be precluded from showing that Defendants could not be found in the district at the time of attachment if GC Logistics was subject to personal jurisdiction in Texas because GC Logistics, though a non-party, would be an alter ego as well, and its presence in the forum would be imputed to all Defendants. Accordingly, though Plaintiff might have a basis for recovery under these circumstances, it could not also have a basis for attachment of the M/V Osprey pursuant to Rule B. In other words, Plaintiff cannot have its cake and eat it too. On the other hand, if it is shown that GC Logistics was *not* subject to personal jurisdiction, then neither it nor its alter egos could be found in the district. Therefore, assuming *arguendo* that Plaintiff could survive Defendants' motion to dismiss, it is respectfully recommended that the parties have an opportunity to conduct discovery regarding these issues. Accordingly, if Defendants are not entitled to dismissal pursuant to Rule 12(b)(6), it is respectfully recommended that Defendants' motions to vacate attachment, (D.E. 31; D.E. 33), be denied.

## V. RECOMMENDATION

Plaintiff did not show in the pleadings how HNA abused the corporate form of its subsidiaries OHT and OHT Osprey to perpetrate a fraud, illegal act, or other injustice for which it now seeks to remedy. It is therefore respectfully recommended that OHT and OHT Osprey's motion to dismiss, (D.E.31), be granted. In the alternative, it is respectfully recommended that Defendants' motions to vacate, (D.E. 31; D.E. 33), be denied.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 6858239

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5141352

2010 WL 5141352
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. Texas,
Dallas Division.

TEXAS DEMOCRATIC PARTY, et al., Plaintiffs,
v.
DALLAS COUNTY, TEXAS, et al., Defendants.

No. 3–08–CV–2117–P. | Dec. 9, 2010.

**Attorneys and Law Firms**

Chad W. Dunn, K. Scott Brazil, Brazil & Dunn, Houston, TX;
Clay Lewis Jenkins, Jenkins & Jenkins PC, Waxahachie, TX;
Doug W. Ray, Ray Wood & Bonilla, Randall B. Wood, Ray
Wood & Fine, Austin, TX, for Plaintiffs.

E. Leon Carter, Jamil N. Alibhai, Laura A. Russell, Munck
Carter LLP, Dallas, TX, for Defendants.

***MEMORANDUM ORDER***

JEFF KAPLAN, United States Magistrate Judge.

**\*1** Plaintiffs have filed a motion to compel the production
of documents from Defendants Dallas County, Texas and
its Election Administrator, Bruce Sherbet. At issue are
billing records reflecting the time spent, hourly rates, and
fees charged by counsel for defendants which, according
to plaintiffs, are relevant to determining the amount of
fees plaintiffs may recover as the prevailing parties in this
litigation. Defendants counter that plaintiffs never served a
formal discovery request and, in any event, the billing records
are not relevant to the determination of reasonable attorney's
fees. The parties have briefed their respective arguments in a
joint status report filed on December 8, 2010, and the motion
is ripe for determination. [1]

---

[1]    In its December 1, 2010 order requiring the parties to file
a joint status report after conferring on the motion, the
court indicated that it was "inclined to require defendants
to produce copies of their fee statements, after redacting
any privileged or confidential information." *See* Order,

12/1/10 at 1. However, that preliminary ruling was made
before the court learned that plaintiffs never served
defendants with a formal request for production of
documents.

Under Rule 37, a party seeking discovery may move for an
order compelling the production or inspection of documents
if "a party fails to respond that inspection will be permitted
—or fails to permit inspection—as requested under Rule
34."FED. R. CIV. P. 37(a)(3)(iv). It is axiomatic that a court
may not compel the production of documents under Rule 37
unless the party seeking such an order has served a proper
discovery request on the opposing party.*Ledbetter v. United
States,* No. 3–96–CV–0678–X, 1996 WL 739036 at *2
(N.D.Tex. Dec.18, 1996)* ("[A] motion to compel pursuant to
the enforcement provisions of [ ] Rule 37 clearly contemplates
that the parties have relied on the formal discovery rules.");
*see also* Garrison v. Dutcher, No. 1–07–CV–0642, 2008
WL 938159 at *2 (W.D.Mich. Apr. 7, 2008), *quoting Sithon
Maritime Co. v. Holiday Mansion,* No. 96–2262, 1998 WL
182785 at *2 (D.Kan. Apr.10, 1998)* (explaining significant
differences between formal and informal discovery). Here,
plaintiffs maintain that two letters sent to opposing counsel
requesting copies of their billing records constitute a proper
request for production. The first letter, dated January 25,
2010, states:

As you know, your firm recently filed, on behalf of Dallas
County, a motion objecting to the amount of attorneys'
fees Plaintiffs' counsel claims in this case. It has come to
my attention that your firm has billed Dallas County in
excess of the amounts claimed by the Plaintiffs. Your firm's
billings greatly exceed those billed by Plaintiffs despite the
fact Plaintiffs carried the burden of proof.

Under Federal Rules of Civil Procedure 11, your firm had a
duty to inform the Court (1) that the attorneys' fees incurred
by Dallas County were in excess of those claimed by
Plaintiffs' counsel, and (2) why the discrepancy in billing
amounts does not negate the argument and authorities
presented in Dallas County's objection to Plaintiffs' Motion
for Attorneys' Fees and Costs. Your pleading's failure to
provide information on your firm's greater attorneys' fees
billing is a failure to disclose material facts.

Please let me know immediately if you intend to amend
your filings with the Court to include this additional
information or withdraw your objection.

**\*2** (Jt.Stat.Rep., Exh. A). After receiving a response to this
letter, [2] counsel for plaintiffs sent a second letter to opposing

---

counsel on February 3, 2010. That letter states, in pertinent part:

2    Neither party has provided the court with a copy of defense counsel's response to the January 25 letter.

I am in receipt of your letter concerning attorneys' fees. From your letter, I gather it is your belief the attorneys' fees submitted to Dallas County citizens is not relevant to show the reasonableness of Plaintiffs' charges for like or similar services. The fact that your law firm was unwilling to attach an affidavit contesting Plaintiffs' fees reveals your office is unable to do so given its own charges. Since you have refused to inform the Court or produce a copy of your bills, *I assume you will be treating my earlier letter as a Request for Production and will respond accordingly.*

(*Id.,* Exh. B) (emphasis added).

Even if the court treats the January 25 and February 3 letters, taken together, as a formal request for production of documents, the request does not comply with the requirements of Rule 34. Under that rule, a proper request for production must, *inter alia,* "describe with reasonable particularity each item or category of items to be inspected[,]" and "specify a reasonable time, place, and manner for the inspection and for performing the related acts[.]" FED. R. CIV. P. 34(b)(1)(A) & (B). Neither letter describes "with

reasonable particularity" the documents to be produced by defendants. Nor do the letters specify a "time, place, and manner" for production or inspection. Plaintiffs all but ignore these requirements, focusing instead on the relevance of the billing records and defendants' failure to object. Whether the documents are relevant to the determination of plaintiffs' application for attorney's fees is of no significance absent a proper request for production. *See Ghavami v. Alanis,* No. SA–05–CV–0700–RF, 2006 WL 1821700 at *1 (W.D.Tex. Jun. 29, 2006) (court may not compel production of documents, even if relevant, without a formal discovery request). Likewise, defendants have no duty to object to an informal discovery request that does not comply with Rule 34. *See Garrison,* 2008 WL 938159 at *2 (informal letter requests for discovery do not implicate the duties of opposing parties to respond pursuant to Rule 34).

For these reasons, plaintiffs' motion to compel the production of documents [Doc. # 68] is denied. Plaintiffs' request for oral argument is also denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5141352

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 5141352
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
N.D. Texas,
Dallas Division.

TEXAS DEMOCRATIC PARTY, et al., Plaintiffs,
v.
DALLAS COUNTY, TEXAS, et al., Defendants.

No. 3–08–CV–2117–P.   |   Dec. 9, 2010.

**Attorneys and Law Firms**

Chad W. Dunn, K. Scott Brazil, Brazil & Dunn, Houston, TX;
Clay Lewis Jenkins, Jenkins & Jenkins PC, Waxahachie, TX;
Doug W. Ray, Ray Wood & Bonilla, Randall B. Wood, Ray
Wood & Fine, Austin, TX, for Plaintiffs.

E. Leon Carter, Jamil N. Alibhai, Laura A. Russell, Munck
Carter LLP, Dallas, TX, for Defendants.

***MEMORANDUM ORDER***

JEFF KAPLAN, United States Magistrate Judge.

**\*1** Plaintiffs have filed a motion to compel the production
of documents from Defendants Dallas County, Texas and
its Election Administrator, Bruce Sherbet. At issue are
billing records reflecting the time spent, hourly rates, and
fees charged by counsel for defendants which, according
to plaintiffs, are relevant to determining the amount of
fees plaintiffs may recover as the prevailing parties in this
litigation. Defendants counter that plaintiffs never served a
formal discovery request and, in any event, the billing records
are not relevant to the determination of reasonable attorney's
fees. The parties have briefed their respective arguments in a
joint status report filed on December 8, 2010, and the motion
is ripe for determination. [1]

---

[1]     In its December 1, 2010 order requiring the parties to file
a joint status report after conferring on the motion, the
court indicated that it was "inclined to require defendants
to produce copies of their fee statements, after redacting
any privileged or confidential information." *See* Order,

12/1/10 at 1. However, that preliminary ruling was made
before the court learned that plaintiffs never served
defendants with a formal request for production of
documents.

Under Rule 37, a party seeking discovery may move for an
order compelling the production or inspection of documents
if "a party fails to respond that inspection will be permitted
—or fails to permit inspection—as requested under Rule
34." FED. R. CIV. P. 37(a)(3)(iv). It is axiomatic that a court
may not compel the production of documents under Rule 37
unless the party seeking such an order has served a proper
discovery request on the opposing party. *Ledbetter v. United
States,* No. 3–96–CV–0678–X, 1996 WL 739036 at *2
(N.D.Tex. Dec.18, 1996) ("[A] motion to compel pursuant to
the enforcement provisions of [ ] Rule 37 clearly contemplates
that the parties have relied on the formal discovery rules.");
*see also Garrison v. Dutcher,* No. 1–07–CV–0642, 2008
WL 938159 at *2 (W.D.Mich. Apr. 7, 2008), *quoting Sithon
Maritime Co. v. Holiday Mansion,* No. 96–2262, 1998 WL
182785 at *2 (D.Kan. Apr.10, 1998) (explaining significant
differences between formal and informal discovery). Here,
plaintiffs maintain that two letters sent to opposing counsel
requesting copies of their billing records constitute a proper
request for production. The first letter, dated January 25,
2010, states:

> As you know, your firm recently filed, on behalf of Dallas
> County, a motion objecting to the amount of attorneys'
> fees Plaintiffs' counsel claims in this case. It has come to
> my attention that your firm has billed Dallas County in
> excess of the amounts claimed by the Plaintiffs. Your firm's
> billings greatly exceed those billed by Plaintiffs despite the
> fact Plaintiffs carried the burden of proof.

> Under Federal Rules of Civil Procedure 11, your firm had a
> duty to inform the Court (1) that the attorneys' fees incurred
> by Dallas County were in excess of those claimed by
> Plaintiffs' counsel, and (2) why the discrepancy in billing
> amounts does not negate the argument and authorities
> presented in Dallas County's objection to Plaintiffs' Motion
> for Attorneys' Fees and Costs. Your pleading's failure to
> provide information on your firm's greater attorneys' fees
> billing is a failure to disclose material facts.

> Please let me know immediately if you intend to amend
> your filings with the Court to include this additional
> information or withdraw your objection.

**\*2** (Jt.Stat.Rep., Exh. A). After receiving a response to this
letter, [2] counsel for plaintiffs sent a second letter to opposing

counsel on February 3, 2010. That letter states, in pertinent part:

2      Neither party has provided the court with a copy of defense counsel's response to the January 25 letter.

I am in receipt of your letter concerning attorneys' fees. From your letter, I gather it is your belief the attorneys' fees submitted to Dallas County citizens is not relevant to show the reasonableness of Plaintiffs' charges for like or similar services. The fact that your law firm was unwilling to attach an affidavit contesting Plaintiffs' fees reveals your office is unable to do so given its own charges. Since you have refused to inform the Court or produce a copy of your bills, *I assume you will be treating my earlier letter as a Request for Production and will respond accordingly.*

(*Id.,* Exh. B) (emphasis added).

Even if the court treats the January 25 and February 3 letters, taken together, as a formal request for production of documents, the request does not comply with the requirements of Rule 34. Under that rule, a proper request for production must, *inter alia,* "describe with reasonable particularity each item or category of items to be inspected[,]" and "specify a reasonable time, place, and manner for the inspection and for performing the related acts[.]" FED. R. CIV. P. 34(b)(1)(A) & (B). Neither letter describes "with reasonable particularity" the documents to be produced by defendants. Nor do the letters specify a "time, place, and manner" for production or inspection. Plaintiffs all but ignore these requirements, focusing instead on the relevance of the billing records and defendants' failure to object. Whether the documents are relevant to the determination of plaintiffs' application for attorney's fees is of no significance absent a proper request for production. *See Ghavami v. Alanis,* No. SA–05–CV–0700–RF, 2006 WL 1821700 at *1 (W.D.Tex. Jun. 29, 2006) (court may not compel production of documents, even if relevant, without a formal discovery request). Likewise, defendants have no duty to object to an informal discovery request that does not comply with Rule 34. *See Garrison,* 2008 WL 938159 at *2 (informal letter requests for discovery do not implicate the duties of opposing parties to respond pursuant to Rule 34).

For these reasons, plaintiffs' motion to compel the production of documents [Doc. # 68] is denied. Plaintiffs' request for oral argument is also denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5141352

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 722244
Only the Westlaw citation is currently available.
United States District Court,
N.D. Texas, Dallas Division.

TAILIFT USA, INC., Plaintiff,
v.
TAILIFT CO., LTD., Defendant
and Counter–Plaintiff,
v.
TAILIFT USA, INC., Rowan Cornil, Inc.,
d/b/a Sunbelt Industrial Trucks, and
Warren Cornil, Counter–Defendants.

No. Civ.A.3:03–CV–0196–
M.  |  March 26, 2004.

**Attorneys and Law Firms**

Robert B. Cousins, Jr., Lawrence S. Fischman, Glast Phillips
& Murray, Dallas, TX, for Plaintiff.

Randal C. Shaffer, Jeffrey C. Mateer, Mateer & Shaffer,
Dallas, TX, for Defendant.

## ORDER

RAMIREZ, Magistrate J.

**\*1** Before the Court are *Defendant and Counter–Plaintiff's
Motion for Protective Order and Brief in Support,* filed
January 20, 2004, and *Tailift USA, Inc., Rowan Cornil, Inc.,
and Warren Cornil's Response to Tailift Co., Ltd.'s Motion
for Protective Order and Brief in Support,* filed January 27,
2004. The preceding filings were referred to the undersigned
United States Magistrate Judge for hearing, if necessary,
and for determination pursuant to the District Court's Order
Referring Motion, filed January 22, 2004. Based on the
motion, the response, the evidence submitted therewith, and
the applicable law, the Court is of the opinion that the motion
should be GRANTED.

## I.

This is a declaratory judgment action filed by Tailift USA,
Inc. ("Plaintiff") against Tailift Co., Ltd. ("Defendant") to
clarify the parties' duties and obligations under an agreement

to distribute forklifts throughout the United States, Mexico,
and Canada. Plaintiff is a Texas corporation, with its principal
place of business in Dallas, Texas. (Compl. at 1.) Defendant is
an entity created and existing under the laws of the Republic
of China, and its principal place of business is located in Ta
Ya Hsiang, Taichung Hsien, Taiwan, R.O.C. *See id.*Plaintiff
claims that Defendant anticipatorily breached an agreement
to maintain Plaintiff as the exclusive distributor of forklifts in
the United States, Mexico, and Canada. *See id.*On March 14,
2003, Defendant filed its Original Answer, Counterclaim and
Third–Party Complaint seeking relief through several causes
of action against Plaintiff's president, Rowan Cornil, Inc., d/
b/a Sunbelt Industrial Trucks and Warren Cornil. (Resp. at 3.)

On January 13, 2004, Plaintiff served a Notice of Deposition
to depose Defendant in Dallas, Texas, on January 21, 2004.
(Resp. at Ex. A.) Counsel for Defendant had previously
informed Plaintiff's counsel that a deposition of Defendant's
corporate representative "must occur in Taiwan, at their place
of business" via letter dated January 7, 2004. (Mot. at Ex. B.)
Defendant objects to the time and location of the deposition
and filed the instant motion to quash the deposition notice and
obtain a protective order requiring that the deposition occur
only at Defendant's principal place of business in Taiwan,
R.O.C.

## II.

Defendant moves for a protective order under FED. R. CIV. P.
26(c) on the grounds that its corporate representative should
be deposed at the location of its principal place of business in
Taiwan, R.O.C. Rule 26(c) requires that the movant establish
"good cause" to obtain a protective order. This court has broad
discretion to determine the appropriate place for examination.
*See Resolution Trust Corp. v. Worldwide Ins. Mgmt. Corp.,*
147 F.R.D. 125, 127 (N.D.Tex.1992). This discretion is
guided by the presumption that " '[t]he deposition of a
corporation by its agents and officers should ordinarily be
taken at its principal place of business,' especially when ...
the corporation is the defendant."*Salter v. Upjohn Co.,* 593
F.2d 649, 651 (5th Cir.1979); *see also Resolution Trust Corp.,*
147 F.R.D. at 127 (citing *Turner v. Prudential Ins. Co.,* 119
F.R.D. 381, 383 (M.D.N.C.1988); *Moore v. Pyrotech Corp.,*
137 F.R.D. 356, 357 (D.Kan.1991); *Farquhar v. Shelden,* 116
F.R.D. 70 (E.D.Mich.1987)). This presumption is based on
the concept that it is the plaintiff who brings the lawsuit and
who exercises the first choice as to the forum. *See Payton v.
Sears, Roebuck & Co.,* 148 F.R.D. 667, 669 (N.D.Ga.1993)

(citing *Farquhar,* 116 F.R.D. at 72). Courts have determined that this presumption satisfies the Rule 26(c) requirement of good cause. *See, e.g., Chris–Craft Indust. Prod., Inc. v. Kuraray Co., Ltd.,* 184 F.R.D. 605, 607 (N.D.Ill.1999) ("[t]he purposes underlying the general rule that the depositions should proceed at the corporation's principal place of business create a presumption that the corporation has good cause for a protective order.") (quoting *Sears v. American Entm't Group, Inc.,* 1995 WL 66411, at *1 (N.D.Ill. Feb.13, 1995)).

**\*2** A party may overcome the presumption, however, by showing that peculiar circumstances justify conducting the deposition at a location other than the corporation's principal place of business. *See Salter,* 593 F.2d at 652 (noting that the deposing party failed to show "peculiar circumstances" to rebut the presumption); *see also Chris–Craft Indust. Prod., Inc.,* 184 F.R.D. at 607 (noting that the corporation's objection to a deposition elsewhere should be sustained unless there are "unusual circumstances"); *accord Zuckert v. Berkliff Corp.,* 96 F.R.D. 161, 162 (N.D.Ill.1982) (same) (citing *Salter,* 593 F.2d at 652). In *Resolution Trust Corp.,* a court in this District enumerated five factors for consideration when determining whether sufficient circumstances had been shown to overcome the presumption:

1. Counsel for the parties are located in the forum district;

2. The deposing party is seeking to depose only one corporate representative;

3. The corporation chose a corporate representative that resides outside the location of the principal place of business and the forum district;

4. Significant discovery disputes may arise and there is an anticipated necessity of the resolution by the forum court; and

5. The claim's nature and the parties' relationship is such that "an appropriate adjustment of the equities favors a deposition site in the forum district."

*Resolution Trust Corp.,* 147 F.R.D. at 127 (quoting *Turner,* 119 F.R.D. at 383–84). The court concluded that it "must ultimately consider each case on its own facts and the equities of the particular situation."*Id.*

In this case, Plaintiff alleges that Defendant's motion "sets forth no facts that favor taking its deposition in Taiwan."However, the burden to show sufficient circumstances to overcome the presumption that Defendant's

corporate representative should be deposed at its principal place of business is on Plaintiff. *See Salter,* 593 F.2d at 652 (finding that *plaintiff* did not show peculiar circumstances to overcome the presumption); *see also Six West Retail Acquisition, Inc. v. Sony Theatre Mgmt. Corp.,* 203 F.R.D. 98, 107 (S.D.N.Y.2001) (same); *Payton,* 148 F.R.D. at 669 (finding that *plaintiffs* produced no compelling reason to depart from the general rule).

In support of its position that the deposition should take place in this District, Plaintiff notes that all counsel of record are located here, which is the first factor cited in *Resolution Trust Corp.* This assertion assumes that Defendant does not have counsel at its principal place of business in Taiwan, and that its local counsel in this District would also have to travel to Taiwan for the deposition. Even if this assumption is correct, "the convenience of counsel is less compelling than any hardship to the witnesses."*Six West Retail Acquisition, Inc.,* 203 F.R.D. at 108 (quoting *Devlin v. Transportation Comm. Int'l Union,* 2000 WL 28173, at *4 (S.D.N.Y. Jan.14, 2000). Plaintiff has not presented evidence that its counsel would incur hardship by traveling to Taiwan. Courts have held that plaintiffs normally cannot complain if they must take discovery at great distances from the forum. *See Payton,* 148 F.R.D. at 669 (citing *Farquhar,* 116 F.R.D. at 72).

**\*3** Plaintiff also alleges that it seeks to depose only one witness, which is the second factor considered in *Resolution Trust Corp.* However, Plaintiff's deposition notice was issued pursuant to FED. R. CIV. P. 30(b)(6) and seeks the deposition of "one or more officers, directors, or managing agents, or other persons" regarding thirty-three different topics. There has been no showing that only one witness will be designated for deposition on all thirty-three topics. Having the deposition at the Defendant's principal place of business will be more efficient to the extent that additional witnesses are needed for some of the listed topics.

As to the fourth factor, although Plaintiff argues that the deposition should be conducted in this forum in order to have ready resort to the Court to resolve discovery disputes, there have been no previous discovery disputes in this case. The mere possibility of such disputes does not necessarily weigh in favor of conducting the deposition here. *See Rapoca Energy Co., L.P. v. Amci Export Corp.,* 199 F.R.D. at 191, 193 (W.D.Va.2001) (finding that this factor did not weigh against the presumption because the court had "no reason to anticipate the likelihood of additional discovery disputes which would necessitate the court's intervention.").

Regarding the fifth factor, both parties in this case are corporations, and Plaintiff has not alleged that it would suffer financial hardship if its counsel traveled to Taiwan. *See Turner,* 119 F.R.D. at 384 (finding that financial hardship favored the plaintiff who was "a small employer" and the defendant was "a large company whose officers may be expected to travel with minimal inconvenience."); *see also Rapoca Energy Co.,* 199 F.R.D. at 193 (noting that the case involved two corporate parties, and the deposing party showed no evidence that paying for its counsel's travel would be a hardship). Although Plaintiff generally alleges that it would be more efficient and inexpensive to secure a deposition location and court reporter in this District, Plaintiff fails to provide any evidence that it would be inefficient or costly to secure these matters in Taiwan. In this case, both corporations appear equally "well-equipped to bear the costs associated with the deposition"*See Six West Retail Acquisition, Inc.,* 203 F.R.D. at 107.

In addition to the foregoing *Resolution Trust Corp.* factors, Plaintiff alleges that the one presumed deponent, the sole owner and chief executive officer who resides in Taiwan, has traveled to Dallas on a number of occasions in furtherance of his company's business. (Resp. at Ex. C.) Whether the persons sought to be deposed often engage in travel for business purposes is another factor that some courts have considered. *See Rapoca Energy Co.,* 199 F.R.D. at 193; *Armsey v. Medshares Mgmt. Serv.,* 184 F.R.D. 569, 571 (W.D.Va.1998). Even assuming *arguendo* that the owner will be the lone witness, the fact that he has traveled to the United States only seven times since 1998, and only for a few days each time, hardly presents a frequency of presence in the United States that weighs in favor of overcoming the presumption. *See Six West Retail Acquisition, Inc.,* 203 F.R.D. at 108 (rejecting the plaintiff's argument that the witness regularly traveled to forum district on business and that scheduling deposition on one of the trips would lessen disruption to the witness's schedule and the defendant's business).

**\*4** Plaintiff further contends that Defendant should be treated as a plaintiff in this action because it asserts permissive counterclaims. (Mot. at 4–5.) Courts in other districts have considered the filing of counterclaims, including whether the counterclaims are permissive or compulsory, when determining the location of a defendant's deposition. *See Rapoca Energy Co.,* 199 F.R.D. at 193; *Chris–Craft Indust. Prod., Inc.,* 184 F.R.D. at 607–08; *Armsey,* 184 F.R.D. at 571;

*Zuckert,* 96 F.R.D. at 162–63. This Court find the reasoning in *Rapoca Energy Co.* persuasive. Whether or not Defendant's counterclaims are permissive or compulsory, it would be unfair to require Defendant's corporate representatives to travel here "simply because it made the determination that economy would be served by the same court hearing" its counterclaims, in light of the above factors. *See Rapoca Energy Co.,* 199 F.R.D. at 194. "Clearly the parties' dispute can be resolved far more easily, more expeditiously, less expensively and with far more efficient use of judicial resources if all aspects of the dispute are consolidated before the same court."*Id.* (citing *Zelenkofske Axelrod Consulting, L.L.C. v. Stevenson,* 1999 WL 592399 (E.D.Pa. Aug.5, 1999)).

Finally, Plaintiff also contends that Defendant should be treated as a plaintiff in this action based on its filing of a third party action. (Mot. at 4–5.) This factor was considered by the court in *Chris–Craft Industrial Products, Inc.,* 184 F.R.D. at 608. As in *Chris–Craft Industrial Products, Inc.,* the Court notes that this deposition was noticed by Plaintiff, not the third-party defendant. Further, a review of the thirty-three topics listed in the deposition notice reveals issues that appear to be primarily related to Plaintiff's complaint and the answer thereto. Under these circumstances, and for the same reasons as the counterclaims, the third-party complaint does not weigh in favor of overcoming the presumption. *See id.*(finding that the fact that the defendants filed a third-party action did not require deviation from the general rule favoring the corporation's place of business where requested deposition was noticed by plaintiff and did not pertain to third-party complaint).

## III.

After considering all of the foregoing factors, the Court finds that Plaintiff has failed to overcome the presumption that Defendant's corporate representative should be deposed at its principal place of business in Taiwan, R.O.C. Consequently, *Defendant and Counter–Plaintiff's Motion for Protective Order and Brief in Support* is hereby GRANTED. It is therefore

ORDERED that the deposition of Defendant's corporate representative shall be conducted at Defendant's principal place of business in Taiwan, R.O.C. on a mutually agreeable date and time within 30 days from the date of this Order, unless otherwise agreed by the parties.

SO ORDERED

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 722244

---

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.